McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
(973) 993-8100
Attorneys for Defendant,
Jenkens & Gilchrist

| | |
|---|---|
| AMBOY BANCORPORATION, a New Jersey Corporation, | CIVIL ACTION No. 02-5410 (DMC) |
| Plaintiff, | Hon. Dennis M. Cavanaugh, U.S.D.J. |
| vs. | |
| JENKENS & GILCHRIST a Professional Corporation; and THE BANK ADVISORY GROUP, INC., a Texas Corporation, | DECLARATION OF JAMES G. GARDNER IN SUPPORT OF JENKENS & GILCHRIST'S MOTION FOR AN ORDER IN LIMINE TO EXCLUDE TESTIMONY BY PLAINTIFF'S EXPERT STEVE THEL CONCERNING ALLEGED DAMAGES AND FOR PARTIAL SUMMARY JUDGMENT WITH RESPECT TO DAMAGES |
| Defendant(s). | |

James G. Gardner declares as follows:

1.      I am a member of the firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP,

co-counsel for defendant Jenkens & Gilchrist, P.C. in the above captioned matter.

2.      In that capacity, I have knowledge of the content of the pleadings and discovery

in the within matter.

3.      Based upon the foregoing, I make this declaration.

4.      Attached hereto as **Exhibit A** is a true copy of relevant pages of the transcript of

motion proceedings held March 20, 2006.

5.      Attached hereto as **Exhibit B** is a true copy of relevant portions of the expert

report supplied by Steve Thel with respect to the right of Amboy's squeezed-out shareholders to

recover fair value in the absence of a misleading proxy statement.

6.      Attached hereto as **Exhibit C** is a true copy of relevant portions of the transcript of the deposition of Steve Thel.

7.      Attached hereto as **Exhibit D** is a true copy of relevant excerpts of the summary section of Amboy's Proxy Statement.

8.      I declare that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _____
James G. Gardner

Dated: April __11__, 2008

# Exhibit A

1

1     IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF NEW JERSEY

3

4  AMBOY BANCORPORATION, a  : Civil Action
   New Jersey Corporation,    No. 02-5410 (DMC)
5             :

         Plaintiff,
6             :

        v.
7             : TRANSCRIPT OF
   THE BANK ADVISORY GROUP, a   PROCEEDINGS
8  Texas Corporation, and    :
   JENKENS & GILCHRIST, a Texas
9  Corporation,       :

10       Defendants. :
   -------------------------------x
11

12           Newark, New Jersey
            March 20, 2006
13

14

15

  BEFORE:
16

     THE HON. DENNIS M. CAVANAUGH, U.S.D.J.
17

18

19           Reported by
           CHARLES P. McGUIRE, C.S.R.
20          Official Court Reporter

21

22

    Pursuant to Section 753, Title 28, United States
23   Code, the following transcript is certified to be
   an accurate record as taken stenographically in
24   the above entitled proceedings.

25
       _____
      CHARLES P. McGUIRE, C.S.R.


     CHARLES P. McGUIRE, C.S.R.

```
 1              MR. GRAHAM:  And he should know they're going to

 2    get sued again.

 3              THE COURT:  If he doesn't, he will.

 4         (Laughter)

 5              MR. GRAHAM:  What I would ask you to do is, would

 6    you keep open your mind until I show you this case, until

 7    you've seen it?  I think it may affect your view.  If it

 8    doesn't, no harm done.

 9              THE COURT:  Okay.  I'll keep it open.

10              MR. GRAHAM:  Thank you.

11              THE COURT:  But I think -- and assuming that my

12    position remains the same -- because I think you're fighting

13    a very, very difficult standard here; I think that's the

14    problem right now.  But assuming my mind remains the same, I

15    would think -- and I'll give you a chance to submit that to

16    me with a short letter memo, and I'll let Mr. Kearney, of

17    course, respond to it, if necessary -- but I think at the

18    end of the day it would serve to assist the Court if there

19    is -- because this case is going to be -- the damage aspects

20    I can see being involved.  I think if there's some way that

21    we can look at this beforehand, probably through an

22    in limine application on the damages, I think that's a way

23    to look at it.  And it might be that you were correct, and

24    much of the damages might be eviscerated; I just don't know.

25              But I think at our point here, under a Rule 7.1
```

# Exhibit B

**Amboy Bancorporation v. Jenkens & Gilchrest & The Bank Advisory Group, Inc.**
**Civil Action No. 02-CV-5410 (DMC)**
**United States District Court**
**District of New Jersey**

## REPORT OF STEVE THEL

I have been retained by Pitney Hardin LLP, attorneys for the plaintiff in the above-captioned proceeding, to testify as to the matters discussed herein. This report contains the disclosures required by Federal Rule of Civil Procedure 26(a)(2)(b). In addition to the analysis contained herein, I may offer additional testimony, including opinions and analysis, in one or more supplemental reports, by deposition or at trial, and in response to reports or testimony of other experts or witnesses.

### PROFESSIONAL BACKGROUND

I am the I. Maurice Wormser Professor of Law at Fordham University in New York City, where I teach courses in contracts, corporate law and securities regulation. My resume, which documents my qualifications and includes a list of my publications, is appended to this report. I have taught securities regulation every year since 1985, at the Fordham, Columbia, Cornell and Mississippi law schools, and I have taught the course in corporate finance about 15 times. I have testified as an expert and submitted expert reports, declarations and affidavits on contract law, securities regulation, corporate practice and securities industry practice in various judicial proceedings and arbitrations, and have been retained by the United States to testify as an expert in numerous criminal securities fraud cases and by the SEC to testify in judicial and administrative cases. A list of the matters in which I have testified as an expert at trial or by deposition recently, including within the preceding four years, is also appended to this report.

1

### *Damages*

I understand that the defendants may argue that Amboy Bancorporation was not harmed by the false Proxy Statement because its cashed-out shareholders were entitled to judicially-determined fair value in any case. This argument ignores other injury Amboy Bancorporation suffered by using the inadequate Proxy Statement, including the cost of the shareholder litigation and the foregone opportunities to pursue other methods of cashing out shareholders or simply to choose not to proceed at all. It also ignores Amboy Bancorporation's right to return of the fees paid to the defendants. More importantly, the argument's premise is flawed–shareholders are not simply entitled to fair value.

In its Brief in Support of Its Motion For Summary Judgment, Jenkens & Gilchrist baldly asserts that "[t]he shareholders whom Amboy wanted to cash out were entitled as a matter of law to be paid fair value for their stock." At 1. This statement is incorrect. As the Proxy Statement states–and I do not understand that the defendants have attempted to distance themselves from the statement–"Shareholders who are receiving cash do not have the right to dissent from the Merger." Proxy Statement at 47. Indeed, if the law were as Jenkens & Gilchrist now posits, there would have been no reason for Amboy Bancorporation even to have obtained a fairness opinion; nor would there have been any reason for it to take any of the other steps it took to ensure that the merger would survive challenge; nor, would Mr. Weinstock have had any reason to counsel the Bancorporation to take such steps. (Although I understand there is some dispute over precisely what steps he recommended, I think it is uncontested that he did offer some counsel.)

More to the point, the plaintiffs in the shareholders litigation did not prevail because they "were entitled as a matter of law to be paid fair value for their stock." Jenkens & Gilchrist Brief

in Support of Its Motion for Summary Judgment at 1. On the contrary, they prevailed because, as was predictable, the New Jersey courts found that the Proxy Statement was misleading. The New Jersey courts did not say that cashed-out shareholders are simply entitled to judicially-determined fair value no matter what the merging corporations do or say, nor is that the law. (If it were, or if the courts had found that it was, the opinions would have been much shorter.)

The reason Amboy Bancorporation's cashed-out shareholders were entitled to judicially-determined fair value was that the Proxy Statement was false and incomplete. Each plaintiff complained that the Proxy Statement contained misrepresentations. See Casey v. Brennan, 344 N.J. Super. 83, 97, 780 A.2d 533, 561-62 (N.J. Super. Ct. App. Div. 2001) id. at 97, 780 A.2d at 561-62. The trial and appellate courts repeatedly and emphatically stated that the Proxy Statement was misleading. They also found that by issuing the misleading and incomplete Proxy Statement, the directors had failed in their duty to fully disclose all material facts. See id. at 103-04, 780 A.2d at 565-66 (discussing trial court opinion); id. at 110, 780 A.2d at 569 ("The trial judge found that the proxy statement was materially deficient, or misleading. . . .. It necessarily follows that the directors breached their duty of fair dealing with the minority shareholders and thus had the burden of proving that the price offered for the shares was fair."). The decisions at trial and on appeal turned on the point that the Proxy Statement was false and misleading.

The trial court underscored this point when it declined to give any remedy to dissenting shareholders who accepted payment because those shareholders had not been misled by the Proxy Statement. Id. at 104, 780 A.2d at 566; id. at 116, 780 A.2d at 573 ("Even those plaintiffs who had surrendered their shares were entitled to recover if they had voted for the plan, presumably because they relied on the representations in the proxy statement about the fairness of the offered price. Casey and Gagliano were permitted to recover because they had not

14

surrendered their shares, even thought they had voted against the plan.  However, those plaintiffs who had voted against the plan, but then surrendered their shares . . . were not permitted to recover, because they presumably had not relied or had stopped relying upon the representations contained in the proxy statement."); *see also id.* at 116, 780 A.2d at 573 ("However, the judge also concluded that if 'fully informed minority shareholder[s] knowing all of the material facts regarding the merger' nonetheless acquiesced by surrendering their shares and accepting the offered price, he or she must be bound by that acceptance.") (*quoting* trial court); id. at 104, 780 A.2d at 566 ("In essence, the judge concluded that those shareholders were estopped from recovery.")  The appellate court reversed the trial court on this point, but not because all shareholders are entitled to judicially-determined fair value.  Instead, the appellate court found that it would be "inequitable" to allow directors who issued a misleading proxy statement to use estoppel. *Id.* at 117-18, 780 A.2d at 574.  Indeed, the appellate court approvingly cited Delaware authority holding that under the doctrines of estoppel and acquiescence, a fully informed minority shareholder who votes in favor of a merger or accepts the cash-out may not thereafter attack the fairness of the merger. *Id.* at 118-19, 780 A.2d at 574-75.  Those doctrines were not available to Amboy Bancorporation, however, because the Proxy Statement was misleading.  Thus if the Proxy Statement had been complete and accurate, no cashed-out shareholder who voted for the merger and/or cashed her check would have been able to challenge the fairness of the merger.  Indeed, while it took the position that shareholders who voted for the transaction and/or accepted the consideration offered by Amboy Bancorporation were barred from attacking the fairness of the transaction, Jenkens & Gilchrist itself recognized that this defense would be lost if the Proxy Statement was found to be inadequate. See Memorandum of Charles A. Gall to Marshall Simmons, Nov. 16, 1998, at 1-2 (Exhibit I to Declaration of Dennis T. Kearney, Sept.

6, 2005); see also Affidavit of Stanley J. Koreyva Jr., Sept. 2, 2005, at ¶ 4 (Exhibit H to Declaration of Dennis T. Kearney, Sept. 6, 2005) ("Amboy printed the language 'FULL AND FINAL PAYMENT @ $73.00 per share to holders of record 12/2/97['] on the checks on the advice of Jenkens.").

The plaintiffs in the shareholder litigation who were not statutory dissenters prevailed because, and only because, the Proxy Statement was false and incomplete. If the Proxy Statement had accurately described the fairness opinion, shareholders who voted for the merger and shareholders who voted against the merger but cashed their checks would not have been entitled to relief. I understand that the Bancorporation has already had to pay these shareholders an additional $27 per share beyond the $73 per share provided in the merger agreement, or a total of over $21,000,000 (including interest). The great bulk of further damages that it may have to pay in the future will also be payable to these shareholders, and I understand that they may be entitled to an additional $14 per share, or a total of $8,750,000 plus interest. All of these expenses were suffered only because the Proxy Statement was inaccurate, and thus constitute part of the Bancorporation's damages.

### OTHER DISCLOSURE

I have not yet created any exhibits to be used as a summary of or support for the testimony I intend to offer in this matter, although I may create such exhibits in the future and use them as a summary of or support for my testimony. I may also during my testimony refer to exhibits prepared by others or introduced at trial by the defendants or others.

I will be compensated for my study and testimony in this matter at my normal rate of $500 an hour. I will also be reimbursed for my out-of-pocket expenses if I choose to bill for

# Exhibit C

Dep of Steve Thel.V1

1

```
1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2              Civil Action No. 02-5410(DMC)

3

4   AMBOY BANCORPORATION, a New        )
    Jersey corporation,                )
5                                      )
                   Plaintiff,          )
6                                      )      DEPOSITION OF:
          vs.                          )
7                                      )      STEVE THEL
    JENKENS & GILCHRIST, a             )
8   Professional Corporation; and      )
    THE BANK ADVISORY GROUP, INC.,     )
9   a Texas corporation,               )
                                       )
10                 Defendants.         )
                                       )
11  _____ )

12

13           TRANSCRIPT of the stenographic notes of

14   the proceedings in the above-entitled matter, as

15   taken by and before MONIQUE VOUTHOURIS, a Certified

16   Court Reporter, RPR, CRR, and Notary Public of the

17   States of New Jersey and New York, held at the

18   office of DAY PITNEY, LLP, 200 Campus Drive,

19   Morristown, New Jersey, on Friday, January 26, 2007,

20   commencing at 10:19 a.m.

21

22

23

24

25
```

2

```
1   A P P E A R A N C E S:
```

Page 1

Dep of Steve Thel.V1

23   think it's a fair construction of the statute, that

24   they were not entitled to the rights of dissenters

25   under the statute.

87

1        Q.      So they could not avail themselves of

2    the procedures for dissenting that the statute sets

3    out.  Correct?

4        A.      I had assumed that and that's a

5    reasonable reading of the statute, yes.

6        Q.      And it's your view that as to those

7    persons, absent a misleading proxy statement, they

8    would not be entitled to fair value?

9        A.      I would want to know more, who -- yes,

10   it is my reading -- it is my belief because -- and

11   it is true that those people without more are not

12   entitled to fair value simply because they are

13   cashed-out shareholders.

14       Q.      When you say it's true, is that based

15   upon what you understand the law to be?

16       A.      Yes, because that is what the law is.

17       Q.      Is that the law in New Jersey?

18       A.      Yes.

19       Q.      And is there any specific statute or

20   case that you rely upon in concluding that that's

21   the law in New Jersey?

22       A.      The argument that everyone is

23   entitled -- yes, it is the case law in New Jersey

24   and the statute in New Jersey that gives people

25   certain kinds of rights.  The idea that every

88

Dep of Steve Thel.V1

1    shareholder is entitled to fair value makes you
2    wonder why do you have a dissenter's statute,
3    everybody is entitled to fair value.  It sets the
4    statutory scheme on its head.  There is no basis for
5    saying that any cashed-out shareholder is entitled
6    to fair value, because there is no statutory scheme
7    or case law that allows it, and if that were the
8    law, there would be no dissenter's rights because
9    everybody gets fair value, and there would be no
10   proxy statements because everybody gets fair value.
11        Q.     Well, the New Jersey dissenter's right
12   statute sets forth a procedure for a shareholder to
13   ask for a determination of fair value.  Is that
14   right?
15        A.     Close enough, that's correct.
16        Q.     And part of the intent of that statute
17   is to provide a method for a challenge to the price
18   offered to be done in an expeditious manner by a
19   shareholder that has dissenter rights.  Is that
20   true?
21        A.     It's hard to know what the purpose of
22   the statute is, but that's a reasonable statement of
23   the purpose of the statute, yes.
24        Q.     Now, the fact that there are persons
25   who can't avail themselves of the statutory method

                                                    89


1    of seeking a determination of fair value doesn't
2    necessarily mean that those persons don't have a
3    right to fair value, does it?
                    Page 77

Dep of Steve Thel.V1

4          A.     No.  In fact, I believe that in some
5    circumstances they are entitled to fair value, for
6    example, when the merger is accomplished by means of
7    a misleading proxy statement.
8          Q.     But it's your view that without
9    something more, such as a misleading proxy
10   statement, they are not going to be able to pursue
11   fair value.  Is that right?
12         A.     They are certainly able to pursue it.
13   They are not entitled to get it from it pursuant to
14   a court order.
15         Q.     And that's based upon your
16   understanding of what New Jersey law is on this
17   subject.  Is that correct?
18         A.     Yes, it's based on that.  It's based on
19   having taught the stuff, taught corporate law,
20   securities regulation for 20 years.  It's based on
21   the structure, the deep structure of corporate law
22   and fiduciary duties, it's based on all of that.
23   But it is certainly -- that includes New Jersey law.
24         Q.     Is there a specific New Jersey decision
25   or group of decisions that address this issue?

                                        90


1          A.     I have done my best, I can find no
2    support in New Jersey or Delaware, and I have tried
3    to do this, that supports the proposition that a
4    cashed-out shareholder is entitled without more to
5    fair value.  There is no support for that
6    proposition.
7          Q.     And does that review of the law include
                         Page 78

Dep of Steve Thel.V1

8    your review of the Appellate Division decision in

9    Casey vs. Brennan?

10       A.    Yes.

11       Q.    So your reading of Casey vs. Brennan is

12   that there is nothing in that decision that

13   requires -- I'm sorry -- there is nothing in that

14   decision that entitles a cashed-out shareholder to

15   fair value as a matter of law.  Is that right?

16            MR. KEARNEY:  Objection to form.

17   Without more you mean --

18       A.    Yes, without more, there is absolutely

19   nothing, and, in fact, it is the contrary.  They --

20   the Court goes to great length to point out that

21   there is, in fact, a misleading proxy statement.  If

22   the rule were you're simply entitled to it, that

23   opinion would be three pages long.

24            If that were the rule there --

25            MR. KEARNEY:  Wait for a question.

                                                      91


1        Q.    Now, Professor, is it your conclusion

2    that but for the -- what you've termed to be the

3    misleading proxy statement in this case, the

4    cashed-out shareholders of Amboy Bancorporation

5    would not have been entitled to recover $114 per

6    share as opposed to the $73 per share that was

7    originally offered?

8        A.    Are we cutting out -- cutting out the

9    statutory dissenters, that's correct, that is my

10   opinion.

11       Q.    You think that's true of all of the

                      Page 79

Dep of Steve Thel.V1

12    cashed-out shareholders other than the statutory

13    dissenters?

14          A.    Yes, it is my opinion that that is true

15    of all of those.

16          Q.    There were some distinctions drawn

17    between different categories of cashed-out

18    shareholders by the trial judge in his initial

19    opinion.  You're familiar with that?

20          A.    Yes, I am.

21          Q.    And he found that some of them were

22    estopped from challenging the price, others were

23    not.  Correct?

24          A.    Correct.

25          Q.    Did you understand his different

                                                    92

1    categories of shareholders in that respect?

2          A.    What do you mean did I understand?

3          Q.    Well, did you understand the way he

4    categorized the different shareholders?

5          A.    I think so, yes.

6          Q.    Did you agree with his segregating

7    these different groups of shareholders with respect

8    to how they are treated?

9                MR. KEARNEY:  This is the Boyle

10    decision?

11               MR. JONES:  The Boyle decision.

12          A.    I understood why he did it.

13          Q.    You understand that he applied

14    principles of estoppel or other equitable principles

15    to deny certain people recovery.  Is that right?

                         Page 80

Dep of Steve Thel.V1

16    A.     I would say, yes, including

17   acquiescence.  I'm not sure if that's an equitable

18   principle, yes, but estoppel acquiescence and other

19   equitable principles.

20       Q.     And you understand that in the

21   Appellate Division decision Judge Boyle was

22   overturned with respect to those estoppel or

23   acquiescence rulings that he made.  Is that right?

24       A.     Yes.

25       Q.     Let me ask you this.  If assuming for

                                                      93

1   the moment that Amboy Bancorporation had completely

2   fulfilled its duty of candor, the proxy statement

3   disclosed everything, use of discounts, whatever

4   else, and had still only offered $73 per share for

5   this stock, is there any way that the non-statutory

6   dissenters could have attacked the price that was

7   being offered?

8       A.     They could have voted no.

9       Q.     And if they had voted no, then where

10  would they go?

11      A.     They would vote no.  I'm just

12  responding to your word.  What do you mean by

13  "attack"?

14      Q.     If they vote no, but they don't have

15  sufficient votes to prevent the transaction from

16  going forward, what recourse do they have at that

17  point?

18      A.     They have the recourse to try to figure

19  a cause of action and there is none there.

Dep of Steve Thel.V1

20      Q.      And in your view, then, they are stuck
21  with $73 a share.  Is that right?
22      A.      That's what the law is, yes.
23      Q.      Now, if in this case there had been
24  that kind of full disclosure that you're talking
25  about and this then comes to a vote and $73 a share

                                                    94


 1  has been offered and everybody knows the discounts
 2  that have applied, do you think that this
 3  transaction would have been approved by the
 4  shareholders?
 5      A.      I've thought about that question.  I
 6  don't know what's in their minds, but I believe the
 7  shareholders who voted "yes" felt that getting 73
 8  was good, so it might well have been the fact that
 9  73 is material or that the fair value determination
10  is material doesn't mean that it wouldn't have
11  gotten approved otherwise.  So the question is
12  whether the people wanted their money.
13      Q.      Do you know whether or not the people
14  who were going to survive the squeeze-out, the
15  shareholders who would survive the squeeze-out had
16  enough votes without the other people to get this
17  transaction approved?
18      A.      No, I don't.
19      Q.      In your report, Professor, there is a
20  section on page 16 that states "Other disclosure."
21      A.      I'm glad we're there.
22      Q.      Well, we may go back.
23              You say that you have not created any
                        Page 82

Dep of Steve Thel.V1

24    exhibits to be used as a summary of or support for

25    the testimony that you intend to offer.  Have you

95

1    yet created any such exhibits?

2         A.    No, I have not.

3         Q.    Do you intend to at some point in time?

4         A.    This is a disclosure I understood is

5    required by the rule.  I have not thought about

6    that.

7         Q.    You mention your compensation.  What is

8    your rate that you're being paid for in this matter?

9         A.    It is and has been $500 an hour.

10        Q.    And you're being paid on an hourly

11    basis.  Correct?

12        A.    Yeah, I'm paid by the hours I bill and

13    only on the hours I bill.

14        Q.    And my next question was going to be

15    does the level of your compensation for this case

16    depend in any manner on the outcome of the case?

17        A.    No, I stated it does not, and it does

18    not.

19        Q.    Professor, if you're going to be

20    creating any exhibits for use at trial of this case,

21    I'm assuming that you're going to make them

22    available to your counsel in advance of trial.  Is

23    that your intention?

24        A.    Yes, that will be my intention, and it

25    would be my expectation that they will tell you.

96

Page 83

Dep of Steve Thel.V1

1        Q.    And that's my request, if there are any
2   such exhibits, that they be made available when they
3   are available.
4        A.    And my request is they handle that as
5   with the other things we've talked about.
6        Q.    I think that's all the questions I
7   have, Professor Thel.  Thank you very much.
8             (Ending time: 12:46 p.m.)
9                 *          *          *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                                            97

1                    CERTIFICATE
2
3
                    Page 84

# Exhibit D

# SUMMARY

*The following is a summary of certain information contained in this Proxy Statement and is intended merely to highlight certain information to assist the Shareholders. This brief summary is qualified by the more detailed information set forth in the Proxy Statement in its entirety, including the Exhibits attached hereto. A thorough reading of the entire Proxy Statement is strongly recommended.*

## The Special Shareholders' Meeting

<u>Date, Time and Place of Meeting</u>.  The Meeting will be held at the offices of Amboy National Bank, located at 3590 U.S. Highway 9, Old Bridge, New Jersey, on November 19, 1997, at 3 p.m., local time.

<u>Purpose of the Meeting</u>.  The only matter to be acted upon at the Meeting is the approval and adoption of the Merger Agreement entered into by and between the Company and Newco, which Merger Agreement provides for the acquisition of the Company by Newco by means of the Merger of the Company with and into Newco.  The full text of the Merger Agreement is set forth in <u>Exhibit A</u>.  See "*The Proposed Merger -- Description and Effects of the Merger.*"

<u>Record Date; Quorum</u>.  The Board of Directors has fixed the close of business on October 15, 1997 as the Record Date for the determination of Shareholders entitled to notice of and to vote at the Meeting or any adjournment(s) thereof.  As of the Record Date, 3,166,008 shares of Company Stock were issued and outstanding and held of record by 420 Shareholders.  The presence at the Meeting, in person or by proxy, of the holders of a majority of the shares of Company Stock is necessary to constitute a quorum for the transaction of business at the Meeting.

<u>Vote Required</u>.  Assuming the presence of a quorum, the affirmative vote of Shareholders who own shares of Company Stock representing at least two-thirds (2/3) of the votes cast at the Meeting is required for the approval and adoption of the Merger Agreement.

<u>Revocation of Proxies</u>.  Any Shareholder giving a proxy has the unconditional right to revoke his or her proxy at any time prior to the voting thereof by delivery of a duly executed proxy bearing a later date, or by giving written notice of revocation to the Company addressed to:  Peggy Dembowski, Secretary, Amboy Bancorporation, 3590 U.S. Highway 9, Old Bridge, New Jersey 08857.  No such revocation shall be effective, however, unless such notice of revocation has been received by the Company at or prior to the Meeting.  The presence of a Shareholder at the Meeting is, by itself, not sufficient to revoke a previously executed, valid proxy that has been tendered to the Company.

## The Proposed Merger

<u>Background of and Reasons for the Proposed Merger</u>.  During the past several years, the general market and the regulatory and competitive environment in which the Company and its wholly-owned subsidiary, Amboy National Bank, operate have changed substantially.  Those changes have necessitated that the Company reevaluate its long-term business plans to enhance its future opportunities for success in the very competitive and highly regulated financial services industry.  Over time, the Company's shareholder base has expanded.  The Board of Directors has recognized that many of the Shareholders may desire to liquidate their investment and that no established trading market for the Company Stock exists.

The primary purpose of the Merger is to enable the shareholders of Newco Stock to receive the benefits available under Subchapter S of the Code.  The Board of Directors is considering reorganizing the Company as a corporation qualifying for taxation for federal income tax purposes pursuant to Subchapter S of the Code.  Subchapter S of the Code was amended by the Small Business Job Protection Act of 1996 to

3

JG 04408