# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMBOY BANCORPORATION, a New Jersey Corporation, | : | Civil Action No. 02-5410 (DMC) (MF) |
| | : | |
| Plaintiff, | : | Hon. Dennis M. Cavanaugh, U.S.D.J. |
| | : | |
| v. | : | |
| | : | |
| JENKENS & GILCHRIST, a Professional Corporation; and THE BANK ADVISORY GROUP, INC., a Texas Corporation, | : | |
| | : | Motion Returnable:  May 5, 2008 |
| Defendants. | : | Oral Argument Requested |
| | : | |

---

## BRIEF OF DEFENDANT JENKENS & GILCHRIST IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE TESTIMONY BY PLAINTIFFS' EXPERT STEVE THEL CONCERNING ALLEGED DAMAGES AND IN SUPPORT OF ITS RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

---

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962-2075
Tel:  (973) 993-8100
Fax:  (973) 425-0161

Attorneys for Defendant
Jenkens & Gilchrist,
A Professional Corporation

565412_1

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT.......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT ..................................................................................................................... 7

      POINT ONE:  PROFESSOR THEL'S OPINION TESTIMONY
            ON NEW JERSEY LAW IS INADMISSIBLE................................................. 7

      POINT TWO:  AMBOY'S FORMER SHAREHOLDERS WERE
            ENTITLED TO RECEIVE FAIR VALUE FOR THEIR SHARES
            WHETHER OR NOT THE PROXY STATEMENT WAS MISLEADING....... 9

      POINT THREE:  THE AMOUNTS ABOVE $73 PER SHARE
            THAT AMBOY HAS HAD TO PAY ITS FORMER SHAREHOLDERS
            ARE NOT DAMAGES, AND AMBOY'S CLAIM TO THOSE
            AMOUNTS SHOULD BE DISMISSED AS A MATTER OF LAW .............. 15

CONCLUSION ................................................................................................................. 18

i

## TABLE OF AUTHORITIES

**Page**

**Cases Cited**

Alcman Services Corporation v. Bullock, 925 F.Supp. 252
  (D.N.J. 1996), aff'd, 124 F.3d 185 (3d Cir. 1997)...........................................16-17

Balsamides v. Protameen Chems., Inc., 160 N.J. 352 (1999)....................................10

Bershad v. Curtiss-Wright Corp., 535 A.2d 840 (Del. 1987).................................11-12

Bridgewater Resources Inc. v. Pitney, Hardin, Kipp & Szuch,
  Esqs., Docket No. A-2976-03T5 (decided June 17, 2005) ...............................16-17

Casey v. Brennan, 344 N.J. Super. 83 (App.Div. 2001),
  aff'd, 173 N.J. 177 (2002)...................................................................passim

Casper v. SMG, 389 F.Supp.2d 618 (3d Cir. 2005)...................................................8

In re: Ivan Boesky Securities Litigation FMC Corporation
  v. Boesky, 36 F.3d 255 (2d Cir. 1994)..............................................................15-17

In re: JCC Holding Co. Shareholders Litigation, 843 A.2d 713
  (Del. Ch. 2003)...................................................................................12-13

Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110
  (Del. 1994) ........................................................................................12-13

Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383 (1999) ................................10

Lynch v. J.P. Stevens & Co., Inc., 758 F.Supp. 976 (D.N.J. 1991)...........................8

Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir. 1997)................................8

**Statutes Cited**

N.J.S.A. 14A:11-1 et seq............................................................................3, 7

**Rules Cited**

Fed.R.Evid. 702 ...............................................................................................1, 7

565412_1

## PRELIMINARY STATEMENT

Defendant Jenkens & Gilchrist, A Professional Corporation ("J&G"), hereby moves *in limine* to preclude plaintiff Amboy Bancorporation ("Amboy") from offering any testimony from Steve Thel, one of its proposed experts, concerning Amboy's alleged damages. Professor Thel, who teaches at Fordham University School of Law, has offered the opinion that the proxy statement prepared by J&G for the squeeze-out merger transaction in which Amboy bought back 625,698 shares of its own stock from minority shareholders was misleading, and that as a consequence Amboy has been compelled to pay its former shareholders more than the $73 per share it offered them in the proxy statement. Professor Thel's opinion that the difference between the court-determined fair value of $114 per share and the offered amount of $73 per share represents damages proximately caused by J&G's alleged malpractice is based solely on his interpretation of controlling New Jersey law, which in his view would have precluded any Amboy shareholder who did not have a statutory right to dissent from receiving more than $73 per share if the proxy statement had not been misleading – even though that amount was well below fair value.

Professor Thel should not be permitted to offer this opinion because his testimony about New Jersey law would impermissibly invade the exclusive province of the Court to decide the law. Such opinion testimony is inadmissible under Fed.R.Evid. 702 because it cannot assist the trier of fact to understand the evidence or to determine a fact in issue. Furthermore, Professor Thel is simply wrong with respect to his interpretation of New Jersey law. A careful reading of the Appellate Division's decision in Casey v. Brennan, 344 N.J. Super. 83 (App. Div. 2001), aff'd, 173 N.J. 177 (2002), compels the conclusion that all of Amboy's squeezed-out minority shareholders had the right to receive fair value for their shares based on the duty of fair dealing

1

that Amboy owed them.  Amboy's former shareholders still would have been entitled to recover the fair value of their stock even if the proxy statement had made every disclosure imaginable.

Absent Professor Thel's testimony Amboy has no support for its theory that it has been damaged by reason of having to pay fair value.  The New Jersey state courts have determined that the fair value of the stock in question was $114 per share; Amboy has therefore had to pay an additional $41 per share to all its squeezed-out shareholders.  With a total of 625,698 shares bought back, Amboy's "fair value" claim amounts to $25,653,618 plus interest.  That number represents the bulk of the damage claimed by Amboy in this case.  As a matter of law that amount cannot be damages because Amboy had no legal right to realize a gain at the expense of its former shareholders.  Amboy had an absolute duty to pay fair value irrespective of Jenkens' alleged negligence with regard to the proxy statement.  Accordingly, upon the exclusion of Professor Thel's testimony this portion of Amboy's damage claim should be dismissed by way of summary judgment.

### STATEMENT OF FACTS

The appellate court in Casey v. Brennan held that Amboy's use of minority and marketability discounts was improper in the context of valuing the shares of its former shareholders and concluded that all of those shareholders were entitled to the payment of fair value for their stock – regardless of whether they qualified as statutory dissenters under N.J.S.A. 14A:11-1 et seq., voted for the transaction, or cashed the checks issued by Amboy at $73 per share. On remand, the trial court determined that the fair value of a share of Amboy stock as of the applicable valuation date was $114 per share. That number increased the compensation due each squeezed-out shareholder by $41 per share, resulting in Amboy having to pay an additional $25,653,618 plus interest for the 625,698 shares of stock it reacquired in the squeeze-out merger.

Prior to the issuance of expert reports in this case J&G moved for summary judgment seeking the dismissal of Amboy's damage claim for these amounts. J&G argued that the additional compensation paid for the stock is not a proper measure of damages because Amboy paid no more for the stock than what it was actually worth. The Court denied the motion without prejudice. In thereafter denying J&G's motion for reconsideration, the Court stated that this issue could be addressed at the appropriate time by way of an *in limine* application on damages. (Declaration of James G. Gardner, Exhibit A, Transcript of Proceedings of March 20, 2006, at 26-20 to 26-24).[1]

Subsequently Amboy served the reports of its experts, Steve Thel and Stephen Knee. Only Professor Thel's report purports to articulate a theory of damages. (Exhibit B, Thel Report, pp. 13-16). Professor Thel's only attempt to provide a measure of the alleged damages (other than attorneys' fees and litigation costs) is by asserting that Amboy is entitled to receive from

---

[1] The exhibits cited in this brief are attached to the Declaration of James G. Gardner submitted in support of this motion.

3

J&G the amount of its underpayment of fair value.  He contends that the measure of damages is the difference between the unfair value offered by Amboy to its shareholders and the amount the court determined to be fair, $114 per share.  (Ex. B at 16).  As his report and deposition testimony make clear, however, his opinion that those amounts constitute damages is based exclusively on his reading (actually his misreading) of New Jersey law.

In his expert report, Professor Thel asserts that Amboy's squeezed-out shareholders prevailed because Amboy's directors had failed in their duty to fully disclose all material facts in the proxy statement – not because the price offered was insufficient and thus unfair.  (Ex. B at 14).  He also contends that if the proxy statement had been complete and accurate the cashed-out shareholders who had voted for the merger and/or had cashed the checks issued to them at $73 per share would have been equitably estopped from challenging the fairness of the merger.  (Ex. B at 15).  He offers the following theory of how Amboy was thereby damaged:

> The plaintiffs in the shareholder litigation who were not statutory dissenters prevailed because, and only because, the Proxy Statement was false and incomplete.  If the Proxy Statement had accurately described the fairness opinion, shareholders who voted for the merger and shareholders who voted against the merger but cashed their checks would not have been entitled to relief.  I understand that the Bancorporation has already had to pay these shareholders an additional $27 per share beyond the $73 per share provided in the merger agreement, or a total of over $21,000,000 (including interest).  The great bulk of further damages that it may have to pay in the future will also be payable to these shareholders, and I understand that they may be entitled to an additional $14 per share, or a total of $8,750,000 plus interest.  All of these expenses were suffered only because the Proxy Statement was inaccurate, and thus constitute part of the Bancorporation's damages.

(Ex. B at 16).

Professor Thel confirmed during his deposition that this opinion was based on his understanding of the law of the State of New Jersey.  (Exhibit C, Thel deposition at pp. 87-6 to

87-18).  Professor Thel stated that he had done his best to find support in New Jersey and in

Delaware for the proposition that a cashed-out shareholder is always entitled to fair value, but

that there was no support for that proposition.  (Ex. C at 89-24 to 90-6).  His review of the law

included the Appellate Division's decision in <u>Casey v. Brennan</u>.  (Ex. C at 90-7 to 90-23).

 In response to a hypothetical question, Professor Thel testified that if the proxy statement

had disclosed everything and the merger had still been approved at $73 per share, the

shareholders would not have been able to recover fair value for their shares:

> Q: If they vote no, but they don't have sufficient votes to
> prevent the transaction from going forward, what recourse do they
> have at that point?
>
> A: They have the recourse to try to figure a cause of action and
> there is none there.
>
> Q: And in your view, then, they are stuck with $73 a share.  Is
> that right?
>
> A: That's what the law is, yes.

(Ex. C at 93-14 to 93-22).

 Professor Thel did not know whether the shareholders who would survive the squeeze-

out had enough votes going into the shareholder meeting to get the transaction approved without

the support of the other shareholders.  (Ex. C at 94-13 to 94-18).  However, they did, as at the

time of the shareholder vote there were 3,166,008 shares of Amboy common stock issued and

outstanding.  (Exhibit D, Proxy Statement, at p. 3).  Amboy repurchased 625,698 shares in the

squeeze-out merger (see Final Pretrial Order, Stipulation of Facts, ¶22), meaning the surviving

shareholders owned in excess of 2,500,000 shares of Amboy common stock.  They therefore

held a 4-to-1 voting advantage over the minority shareholders who stood to be squeezed out.

Amboy's by-laws required no more than a two-thirds (2/3) majority of the votes cast at the

5

565412_1

shareholder meeting to approve the transaction.   (Ex. D).   Consequently, the result was a foregone conclusion.

6

## ARGUMENT

## POINT ONE

## PROFESSOR THEL'S OPINION TESTIMONY
## ON NEW JERSEY LAW IS INADMISSIBLE

Professor Thel's report and deposition testimony leave no doubt that his opinion concerning how Amboy has been damaged by the allegedly deficient proxy statement is based entirely on his interpretation of New Jersey law. Specifically, Professor Thel asserts that under New Jersey law Amboy's squeezed-out shareholders (other than the one person who qualified as a statutory dissenter under N.J.S.A. 14A:11-1 et seq.) would not have had a right to receive fair value for their shares in the absence of a misleading proxy statement. It is Professor Thel's view that paying the squeezed-out shareholders less than the fair value of their shares was not, in and of itself, a sufficient legal basis for compelling Amboy to pay fair value. He therefore concludes that Amboy has suffered damage as the result of the allegedly misleading Proxy Statement to the extent it has been required to pay more than $73 per share to all of its squeezed-out shareholders.

Stated bluntly, Professor Thel's view of New Jersey law is wrong. (See Point Two, infra.) In any event, he should not be permitted to tell the jury what New Jersey law has to say about this subject. His explanation of the law would invade the exclusive province of the Court to determine what the law is and to instruct the jury with respect thereto, and is therefore inadmissible.

Fed.R.Evid. 702 permits opinion testimony by experts only in those situations where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Opinion testimony regarding pure questions of law is generally inadmissible because it cannot help the jury in its fact-finding function and because

7

questions of law are the exclusive domain of the judge.  As stated by the Court in <u>Casper v. SMG</u>, 389 <u>F.Supp.2d</u> 618, 621 (D.N.J. 2005):

> The district court must limit expert testimony so as not to allow experts to opine on "what the law required" or "testify as to the governing law." <u>U.S. v. Leo</u>, 941 F.2d 181, 196-197 (3d Cir. 1991).  "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle.'  In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." <u>In re Initial Public Offering Sec. Lit.</u>, 174 F.Supp.2d 61, 64 (S.D.N.Y. 2001) (citing <u>U.S. v. Leo</u>; other citations omitted). [Footnote omitted.]

<u>Accord</u>, <u>Nieves-Villanueva v. Soto-Rivera</u>, 133 <u>F.3d</u> 92, 99-100 (1st Cir. 1997) ("In our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge.  Accordingly, expert testimony on such purely legal issues is rarely admissible. . . . Because the jury does not decide such pure questions of law, such testimony is not helpful to the jury and so does not fall within the literal terms of Fed.R.Evid. 702 . . . ."); <u>Lynch v. J.P. Stevens & Co., Inc.</u>, 758 <u>F.Supp.</u> 976, 1014 (D.N.J. 1991) ("Legal conclusions are not within the ambit of expert testimony permitted under Rule 703 of the Federal Rules of Evidence").

Here, Amboy's theory of how it has been damaged by virtue of having had to pay fair value for the stock of its squeezed-out shareholders is predicated entirely on Professor Thel's interpretation of New Jersey law.  However, the jury will not be asked to determine what New Jersey law has to say on this issue. Only the Court can make that decision.  Accordingly, Professor Thel's testimony on this aspect of Amboy's damage claim should be excluded in its entirety.

8

## POINT TWO

## AMBOY'S FORMER SHAREHOLDERS WERE ENTITLED TO RECEIVE FAIR VALUE FOR THEIR SHARES WHETHER OR NOT THE PROXY STATEMENT WAS MISLEADING

Professor Thel's opinion that Amboy's squeezed-out shareholders would not have been able to recover fair value for their shares absent a misleading proxy statement is directly contradicted by the published decision of the Appellate Division in Casey v. Brennan. His testimony in this regard would not only fail to assist the trier of fact, it would be affirmatively misleading.

In Casey, the court held that all of Amboy's cashed-out shareholders were entitled to receive fair value based on the inadequacy of the offered price, regardless of whether they qualified as statutory dissenters. The court explained that this entitlement stems directly from the fiduciary duty of majority shareholders and directors to treat the minority fairly:

> In our view, the dissemination of an inaccurate or misleading proxy statement in conjunction with a cash-out merger that sets forth an inadequate cash-out price is sufficient to allow non-statutory dissenters to challenge the merger, or claim fair compensation for their shares, unless otherwise precluded by some other statute, doctrine, rule or law. Thus, an allegation that the offered price is unfair is an adequate basis for inquiring into the fairness of the plan, particularly where, as here, it is bolstered by allegations that defendants' statements about the fairness of the price were misrepresentations. In these circumstances our public policy requires that shareholders be permitted to challenge the valuation even though they may not qualify as statutory dissenters. Accordingly, the judge correctly allowed all shareholders to challenge the valuation of the shares.
>
> Ordinarily, all shareholders are entitled to be paid fair value for their shares, because of the fiduciary duty majority shareholders and directors have to treat minority shareholders fairly. The right to be treated fairly is an incident of the obligation of the directors to treat the shareholders, particularly the minority shareholders fairly and is also consistent with the restraint upon

9

> them of using their powers for their own personal advantage to the
> detriment of the minority shareholders.

Id. at 107-108 (emphasis supplied).

The Casey court went on to explain that the duty of majority shareholders to treat minority shareholders fairly in connection with a squeeze-out merger consists of two components: fair dealing and fair price. Id. at 108. The duty of fair dealing involves the duty of candor, which compels the corporation to make disclosure of all material facts relating to the proposed transaction. The legal effect of obtaining shareholder approval of a transaction after full disclosure is to shift the burden of proof to minority shareholders to show that the transaction was unfair. Id. at 109. Under no circumstances, however, does such approval deprive the minority of their right to challenge the fairness of the price paid.

Here, the fact that the court in the shareholder action found the proxy statement to have been misleading may have left Amboy with the burden of proving that the transaction was fair, but it had no bearing whatsoever on the amount that Amboy ultimately was required to pay its former shareholders as fair value for their shares. Amboy failed to meet its burden of proof because the court held, based on New Jersey case law developments that post-dated this squeeze-out merger, that minority and majority discounts could not be applied when valuing shares in this context – not because the proxy statement failed to reveal that discounts had been applied. Id. at 110-112, citing Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383, 407-408 (1999); Balsamides v. Protameen Chems., Inc., 160 N.J. 352, 378-379 (1999). Had the burden of proof rested with the shareholders, the result would have been the same.

Tellingly, Professor Thel altogether ignores the corporation's duty to pay a fair price and claims that there is no right to be paid a fair price absent a breach of the duty of candor. Thel wrongly asserts that the former shareholders who had voted in favor of the merger or who had

10

voted against it but had cashed their checks at $73 per share would have been precluded from challenging the fairness of the price paid had it not been for the existence of a misleading proxy statement. While this does not comport with the Casey decision, Professor Thel points to the Casey court's citation of Bershad v. Curtiss-Wright Corp., 535 A.2d 840 (Del. 1987), for the proposition that under the doctrines of estoppel and acquiescence a fully-informed minority shareholder who votes in favor of a merger or accepts the cash-out may not thereafter attack the fairness of the merger. (Ex. B at 15). In doing so, however, Professor Thel ignores more recent Delaware decisions holding that even fully informed minority shareholders who vote for the merger or accept the merger consideration are not barred from recovering fair value.

The court in Bershad held that "when an informed minority shareholder either votes in favor of the merger, or . . . accepts the benefits of the transaction, he or she cannot thereafter attack its fairness." Id. at 842. Bershad was cited by the Casey court in its discussion of whether the doctrine of equitable estoppel barred recovery by some of Amboy's minority shareholders. 344 N.J.Super. at 117. However, the court in Casey noted that the doctrine of equitable estoppel is only applied in very compelling circumstances. It was quick to distinguish Bershad on the ground that the shareholder in that case was fully informed about the transaction. Id.

Bershad does not have the far-reaching sweep that Professor Thel would give it. That case involved a squeeze-out of the minority shareholders of a subsidiary corporation by its parent corporation, which owned 65 percent of the subsidiary's stock. Plaintiff alleged that the proxy statement was misleading because it failed to disclose that the parent corporation had a strict policy against selling its 65 percent holding and because of that policy there was no market for the subsidiary's shares that the squeezed-out shareholders could use to challenge the price being offered. The court found that the failure to make this exact disclosure was immaterial given

11

other disclosures in the proxy statement that adequately informed the minority shareholders that their investment fate was in the hands of the parent corporation. 535 A.2d at 847. There was no evidence to suggest that the price offered was unfair. Accordingly, plaintiff was barred from challenging the fairness of the transaction.

Where there is a valid issue concerning the fairness of the price being paid, however, Delaware's courts have subsequently ruled that even fully informed shareholders who vote in favor of the transaction and/or accept payment for their stock still have the right to challenge the transaction's fairness. In Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110 (Del. 1994), the Delaware Supreme Court held that "even when an interested cash-out merger transaction receives the informed approval of a majority of minority stockholders or an independent committee of disinterested directors, an entire fairness analysis is the only proper standard of judicial review." Id. at 1117. Subsequently, the court in In re: JCC Holding Co. Shareholders Litigation, 843 A.2d 713 (Del. Ch. 2003), expounded on the holding in Lynch:

> Because Lynch is premised on the empirical assumption that
> stockholder votes on mergers with controlling stockholders
> invariably involve a form of inherent coercion, that case denies
> ratification effect to minority approval of mergers of that kind. As
> a logical consequence, our law cannot . . . coherently say that
> minority stockholders "acquiesce" in the fairness of a merger with
> a controlling stockholder merely by voting yes or accepting the
> merger consideration.

Id. at 716.

The court in JCC went on to state expressly that "a stockholder who casts a vote in favor of, or later accepts the consideration from, a merger effected by a controlling stockholder is not barred by the doctrine of acquiescence, or any other related equitable doctrine such as waiver, from challenging the fairness of the merger in an equitable action." Id. at 722-723. It added, "[E]ven if all of the minority stockholders approve a merger . . . after receiving exemplary

12

disclosure, the unanimous vote would not have the traditional ratification effect of extinguishing equitable challenges to the merger's fairness." Id. at 723.

Based on the decision in Casey it is clear that New Jersey law is no different from Delaware law in this regard.  The court in Casey held that even those shareholders who had sufficient independent knowledge to determine that the price offered was inadequate, and yet accepted the consideration initially tendered by Amboy, were entitled to receive fair value for their shares:

> To hold otherwise would also undermine our strong public policy requiring directors to treat minority shareholders fairly.  A corporation whose directors breach that duty cannot avoid responsibility to a minority shareholder who independently determined that the price offered was inadequate yet after unsuccessfully voting against the proposal cashed out his or her shares at the offered price, which was inadequate.  A contrary holding would reward a corporation that has breached its duty of treating minority shareholders fairly, at the expense of the minority shareholder or shareholders who have suffered damages as a result of that breach.

Id. at 120-121.

Thus, when the price offered a minority shareholder in a squeeze-out merger is unfair, not even actual knowledge on the part of a minority shareholder – the very objective of full disclosure – can preclude the shareholder from recovering fair value for his or her shares.

The key to the holding in Casey and to the holdings of the Delaware courts in Lynch and JCC is the inherently coercive nature of corporate transactions involving mergers with controlling stockholders.  As a matter of public policy, majority shareholders who have a sufficient voting majority to force through a squeeze-out merger cannot get away with cramming an inadequate price down the throats of the displaced minority – no matter how thorough, complete and accurate the disclosures in the proxy statement may be.  Here, the Amboy

13

shareholders who would survive the squeeze-out merger held a 4-to-1 voting advantage over the minority shareholders whose shares were to be repurchased as a result of the squeeze-out merger. Whatever disclosures were made in the proxy statement, and whatever price was offered for the shares being repurchased, this transaction was going to be approved.  This is a fact with which Professor Thel appeared to be unfamiliar at the time of his deposition and yet it lies at the heart of the <u>Casey</u> court's ruling that all of Amboy's former shareholders were entitled to be paid fair value for their stock.

Under the holding in <u>Casey</u>, Amboy owed a duty of fair price to all of its shareholders without regard to whether they were fully informed, voted for the transaction, or accepted the tendered payment.  Accordingly, J&G's role in preparing the proxy statement could not have been a proximate cause of any damage Amboy claims to have suffered by reason of having to pay more than $73 per share as fair value.

14

**POINT THREE**

**THE AMOUNTS ABOVE $73 PER SHARE THAT AMBOY HAS
HAD TO PAY ITS FORMER SHAREHOLDERS ARE NOT
DAMAGES, AND AMBOY'S CLAIM TO THOSE AMOUNTS
SHOULD BE DISMISSED AS A MATTER OF LAW**

The Appellate Division opinion in <u>Casey</u> established that Amboy's squeezed-out shareholders were entitled to be paid fair value for their stock whether or not they had a statutory right to dissent and whether or not the proxy statement was misleading. This entitlement is a function of the fiduciary duty that Amboy owed all its shareholders to treat them fairly. Since Amboy was obligated to pay its shareholders fair value in the context of a coercive transaction like this squeeze-out merger, it cannot claim the difference between the fair value of $114 per share and the offered price of $73 per share as damages.

It is axiomatic that plaintiff does not sustain any legally compensable injury when the damages it claims are amounts that it has an independent obligation to pay. This was the guiding principle behind the court's decision in <u>In re: Ivan Boesky Securities Litigation FMC Corporation v. Boesky</u>, 36 <u>F.3d</u> 255 (2d Cir. 1994), a case in which the damage claims were strikingly similar to those made by Amboy here. In <u>Boesky/FMC</u>, plaintiff FMC Corporation ("FMC") claimed that it had been compelled to pay more for the buy-back of its own shares because its investment advisor had leaked information about FMC's corporate restructuring to Ivan Boesky, who promptly began buying up shares of FMC stock before any public announcement of the restructuring had been made. Boesky's actions drove up the market price of FMC's stock and ultimately forced FMC to increase the value of the package being given to public shareholders from $85 per share to $97 per share. The increase cost FMC an additional $220 million in cash. The appellate court affirmed the trial court's entry of a summary judgment dismissing FMC's claim against its investment advisor for this amount, stating:

15

> Because FMC's duties included making complete disclosure and
> fully compensating its shareholders, beyond showing that the
> transaction became more expensive, FMC must at least show that
> it paid more for the stock than it was worth. <u>FMC could not seek
> the "minimum premium," but rather was obligated to offer a "fair"
> price.</u>

<u>Id.</u> at 262 (emphasis supplied). The court stated that "FMC cannot claim that Boesky stole a

premium the company was entitled to, since FMC had no legitimate interest in realizing a gain at

its public shareholders' expense." <u>Id.</u> It concluded:

> The absence of evidence that the $220 million increased payout
> constituted something other than FMC giving its public
> shareholders full consideration for their stock is fatal to FMC's
> recovery of these amounts.

<u>Id.</u>; <u>accord</u>, <u>Bridgewater Resources Inc. v. Pitney, Hardin, Kipp & Szuch, Esqs.</u>, Docket No. A-

2976-03T5 (decided June 17, 2005), (alleged legal malpractice by waste hauler's attorneys in

allowing judgment to be entered against client was not a proximate cause of any damage where

judgment against hauler was based on compensation due for waste that had already been

delivered and for services that the client had already used; appellate court affirmed summary

judgment dismissing legal malpractice claims); <u>Alcman Services Corporation v. Bullock</u>, 925

<u>F.Supp.</u> 252, 257 (D.N.J. 1996), <u>aff'd</u>, 124 <u>F.3d</u> 185 (3d Cir. 1997) (assignee of legal malpractice

claim by client against whom a default judgment of $7 million had been entered could not prove

that damages were proximately caused by negligence of lawyer in failing to defend action, where

client was actually liable for the full amount of the $7 million judgment; court entered summary

judgment dismissing legal malpractice claim because client had suffered no damages).

So too, here, the $25,653,618 (plus interest) that Amboy claims as damages based on the

judicial determinations of fair value in <u>Casey</u> is an amount that it was legally obligated to pay by

reason of having cashed out its minority shareholders and not by reason of any alleged

16

wrongdoing on the part of J&G.  Amboy has paid its former shareholders the full and fair consideration for their stock as determined by the courts of New Jersey, no less and no more. That fact alone is fatal to Amboy's recovery of any portion of that amount from J&G.  Stated simply, Amboy cannot rightfully claim that it could have and would have gotten away with paying its former shareholders less than the amount to which they were legally entitled had it not been for someone else's negligence.  As in Boesky/FMC, Alcman and Bridgewater Resources, summary judgment should be entered dismissing this claim as a matter of law.

17

## CONCLUSION

For all the foregoing reasons, J&G respectfully requests that the Court (1) rule that Steve Thel will not be permitted to offer any testimony concerning the damages allegedly sustained by Amboy and (2) dismiss by way of summary judgment Amboy's damage claim seeking recovery of the amount greater than $73 per share that it was required to pay its former shareholders.

Respectfully submitted,

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP
Attorneys for Defendant
Jenkens & Gilchrist,
A Professional Corporation

By:     /s/ Edward B. Deutsch
        EDWARD B. DEUTSCH

Dated:  April 11, 2008

18

565412_1