**Day Pitney** LLP
ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054
(973) 966-6300

Attorneys for Plaintiff
Amboy Bancorporation

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AMBOY BANCORPORATION, a New Jersey corporation | : | Hon. Dennis M. Cavanaugh, U.S.D.J. |
| | : | |
| Plaintiff, | | Civil Action No. 02-5410 (DMC) |
| | : | |
| v. | | |
| | : | **FINAL PRETRIAL ORDER** |
| JENKENS & GILCHRIST, a Professional Corporation; and THE BANK ADVISORY GROUP, INC., a Texas corporation | : | |
| | : | |
| Defendants. | : | |

A final pretrial conference having been held before the Honorable Mark Falk, U.S.M.J., Day Pitney LLP (Dennis T. Kearney and Camille V. Otero) having appeared for plaintiff Amboy Bancorporation ("Amboy"), and McElroy Deutsch Mulvaney &

83846451.1

Carpenter, LLP (James G. Gardner) and Graham Curtin P.A. (George C. Jones) having jointly appeared for defendant Jenkens & Gilchrist, ("Jenkens"), and Seidman & Pincus, LLC having appeared for defendant The Bank Advisory Group, Inc. ("BAG"), the following Final Pretrial Order is hereby entered:

1.   **JURISDICTION** (set forth specifically)

Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) inasmuch as Amboy and all of the Defendants are citizens of different states and the amount in controversy, exclusive of interests and costs, exceeds $75,000. The Court has personal jurisdiction over all parties.

2.   **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position.)

**Amboy's (plaintiff) Pending/Contemplated Motions:**

Amboy reserves the right to make additional appropriate *in limine* motions prior to trial.

\* In addition to motions, Amboy submits that it shall raise various evidentiary issues in its Trial Brief as

2

83846451.1

required by section 15A. of the within Final Pretrial Order.

**Jenkens' (defendant) Pending/Contemplated Motions:**

1.   Jenkens to file revised motion *in limine* to exclude all testimony of plaintiff's expert Steve Thel as to applicable law and as to calculation of damages. The time for filing and briefing of the motion is to be set by the Magistrate.

2.   Motion *in limine* to exclude all testimony by plaintiff's expert Stephen Knee as to whether a New Jersey lawyer practicing transactional law in 1997 would have known or should have predicted that New Jersey's courts in the future would reject the use of discounts when valuing stock in the context of a squeeze-out merger (reinstated – previously denied as moot)

3.   Motion *in limine* to exclude the decisions and fact findings of the New Jersey courts in Casey v. Brennan and to preclude any reference thereto (reinstated – previously denied as moot)

4.   Motion *in limine* to exclude all evidence, testimony or argument relating to Jenkens & Gilchrist's representation of Amboy Bancorporation in the shareholder litigation, alleged conflict of interest, and subsequent withdrawal as counsel (reinstated – previously denied as moot)

5.   Motion *in limine* to exclude all testimony by plaintiff's expert Steve Thel concerning other methods by which Amboy allegedly could have achieved its goal of becoming a Subchapter S corporation (reinstated – previously denied as moot)

6.   Motion *in limine* to exclude all evidence, testimony or argument relating to Jenkens & Gilchrist's tax shelter practice, litigation and investigations that arose therefrom, and cessation of the practice of law. (reinstated – previously denied as moot)

3

7.   Motion <u>in limine</u> to exclude all evidence of proxy statements prepared for other clients (reinstated – previously denied as moot)

\* Jenkens shall raise various evidentiary issues in its trial brief as required by section 15A of this pretrial order.

**BAG (defendant)**:

1.   On November 20, 2009 BAG filed an In Limine motion seeking to exclude the testimony of Plaintiff's expert witnesses as to BAG.   The moving, opposing, and reply papers on this motion appear on the docket as entries #169, 170, 171, 173, 174, and 175.   This motion was never decided.   BAG hereby refiles/resubmits this motion and requests that it be decided prior to the start of the trial of this case.

3.   **STIPULATION OF FACTS** (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions, to which the parties agree.)

**Amboy's and Jenkens' Stipulated Facts:**

**Parties**

1.   Amboy Bank (the "Bank") has been a New Jersey based community bank since 1888.   Originally chartered as First National Bank, the name was changed to Amboy Madison National Bank in 1956, and to Amboy Bank in 1991.

2.   Amboy Bancorporation ("Amboy") was incorporated as a New Jersey corporation in April 1984, to serve as a bank holding company.   Amboy Bank is the commercial bank operating subsidiary of Amboy Bancorporation. At the time of the transaction involved in this case the Bank operated thirteen (13) branches in Middlesex, Somerset and Mercer counties.

3.   At the time of the events involved in this case Jenkens & Gilchrist ("Jenkens") was a Texas professional corporation engaged in the practice of law.

4

4.   At the time of the events involved in this case The Bank Advisory Group ("BAG") was a Texas corporation engaged in the business of providing consulting services to financial institutions with respect to the valuation of their stock.

**Background**

5.   The banking industry is competitive and one of active consolidation.   Between 1988 and 1996 the number of banking companies nationwide shrank from 14,000 to 9,000.   In New Jersey the number of banking companies shrank from 128 to 63 during this period.

6.   Amboy's stated policy had been to continue to operate as an independent community bank in the communities it serves.

7.   In the 1990s Amboy faced a challenge because it was accumulating excess capital at a rate that exceeded the rate of its earnings, causing its return on equity to decrease.

8.   In order to remain competitive and address its concerns regarding excess capital, Amboy made three unsuccessful attempts between 1995 and 1997 to buy other banks.

9.   In 1996 Congress passed legislation that for the first time permitted bank holding companies to elect Subchapter S status.   Unlike most other corporations, Subchapter S corporations are not taxed at the corporate level on dividends distributed to shareholders.   26 U.S.C. § 1361.

10.   In or about October 1996 George Scharpf, Amboy's chairman, president and chief executive officer, attended a meeting of the Bank CEO Network in Nantucket, Massachusetts, during which BAG and Jenkens made a joint presentation regarding the opportunity for bank holding companies to convert to Subchapter S status.

11.   Amboy had approximately 420 shareholders in 1996. However, under the federal law Amboy would need to reduce its shareholder base to less than seventy-five (75) qualified shareholders in order to qualify for Subchapter S status. Subchapter S conversion thus presented an opportunity for Amboy to decrease its excess capital by spending cash to buy back the shares of many of its existing shareholders.

5

## The Transaction

12.   In 1997 Amboy retained BAG for the purpose of rendering
an opinion as to the value of Amboy's stock.   The opinion was to
be used in connection with a proposed corporate reorganization
through which the number of Amboy shareholders would be reduced
(by cashing out shareholders) to the point where Amboy would have
fewer than 75 qualified shareholders, so that a Subchapter S
conversion would be possible.

13.   Amboy   retained   Jenkens   to   provide   it   with   legal
representation   in   connection   with   the   proposed   corporate
reorganization.

14.  BAG rendered its valuation report to Amboy on August 15,
1997.   The report valued the shares of the minority shareholders
at $69.50 per share.

15.   On August 19, 1997, Amboy's board of directors voted to
proceed with the corporate reorganization and approved a price of
$73   per   share   to   be   paid   in   connection   with   cashing   out
shareholders.   The cash-out was to be accomplished by means of a
merger   of   the   existing   corporation   into   a   new   Amboy
Bancorporation   whose   ownership   would   include   only   individual
shareholders holding 15,000 or more shares.

16.   BAG thereafter supplied Amboy with a fairness opinion
concluding that the offered price of $73 per share was fair.

17.   In anticipation of a shareholder vote on the proposed
transaction, Jenkens prepared a proxy statement to be sent to
shareholders for the purpose of providing them with information
about the proposed transaction.

18.   The proxy statement was sent to Amboy shareholders on
October   24, 1997.   BAG's fairness opinion was attached as an
exhibit to the proxy statement.

19.   On November 19, 1997, Amboy's shareholders met and
approved the proposed transaction.

20.   Amboy consummated the merger on December 2, 1997.

83846451.1

21. On December 30, 1997, Amboy elected to become a Subchapter S corporation.

22. Amboy bought back a total of 625,698 shares of its own stock. At $73 per share, Amboy paid a total of $45,675,954 to its former shareholders in exchange for their stock.

### Shareholder Litigation

23. On December 5, 1997, Kathryn Casey and Sheila Gagliano, two of Amboy's former shareholders, filed an action in the Superior Court of New Jersey seeking to enjoin or rescind the merger and asking that the court determine the fair value of their shares.

24. Other former shareholders of Amboy later filed separate actions seeking similar relief. All the shareholder actions were consolidated under the case name Casey v. Brennan, Docket No. UNN-C-180-97, in the Superior Court of New Jersey, Chancery Division, Union County.

25. The Casey v. Brennan litigation ended in 2006. The court determined that Amboy's former shareholders were entitled to be paid $114 (an additional $41) per share for their stock.

4. **CONTESTED FACTS** (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.)

### Amboy's (Plaintiff) Contested Facts:

### Parties

1. Defendant Jenkens & Gilchrist ("Jenkens") was a Texas professional corporation, engaged in the business of legal services.

2. On or about March 31, 2007 Jenkens closed its doors and ceased providing legal services. Jenkens is in the process of winding down its business affairs as part of its dissolution.

7

3.    Defendant The Bank Advisory Group, Inc. ("BAG") was a Texas corporation, engaged in the business of specialized consulting to financial institutions on stock valuations.

4.    BAG filed for voluntary Chapter 7 bankruptcy, in the United States Bankruptcy Court for the Western District of Texas, Austin Division, on January 30, 2007.    Pursuant to the Order entered by the Bankruptcy Court on February 28, 2007, BAG is not permitted to expend any monies in its defense of this action.

**Background**

5.    Amboy's stated policy has been to continue to operate as an independent, community bank dedicated to the communities it serves.

6.    Excess capital represented a challenge for Amboy because its accumulation of capital was exceeding the rate of earnings, causing its return on equity to decrease.

7.    In order to remain competitive and address its concern regarding excess capital, between 1995 and 1997 Amboy made three unsuccessful attempts to buy other banks.

8.    At the October 1996 conference in Massachusetts, Weinstock held himself out to have special expertise in a new area of law which permitted banks to become Subchapter S corporations pursuant to 26 U.S.C. §1361.    An amendment to federal tax law in 1996 permitted banks and their holding companies for the first time to qualify for Subchapter S corporate status.  26 U.S.C. 1361.

9.    At the October 1996 conference in Massachusetts, Walters held himself and BAG out to be expert in the field of bank valuations.

10.   Unlike most other corporations, Subchapter S corporations are not taxed at the corporate level on dividends distributed to shareholders.  26 U.S.C. 1361.

11.   Subchapter S conversion presented an opportunity for Amboy to decrease its excess capital by spending cash to buy back much of its outstanding shares, remain independent, and provide certain tax benefits to the remaining shareholders.

8

12.   Amboy had approximately 420 shareholders in 1996.   In order to qualify for Subchapter S status, it was necessary for Amboy to reduce its shareholder base to less than seventy-five (75) qualified shareholders.   26 U.S.C. §1361 (b) (1) (a).

13.   Amboy retained BAG to review the financial condition of Amboy for the purpose of rendering an opinion as to value of Amboy's stock.   The opinion was to be used in connection with a proposed corporate reorganization through which the number of Amboy shareholders would be reduced (by cashing out shareholders) to the point where Amboy would have fewer than 75 shareholders, so that a Subchapter S conversion would be permissible.

14.   The reason Amboy retained Jenkens, as opposed to another law firm, is that Jenkens represented it had specialized expertise in the area of banking transactions nationwide.

15.   According to the Jenkens Retainer Agreement, Jenkens agreed to: (1) evaluate the eligibility of shareholders of Amboy to be shareholders in a company that has elected Subchapter S tax treatment; (2) advise the Board of Amboy on fiduciary duty issues associated with the proposed holding company merger; (3) prepare and process the regulatory applications with the proposed holding company merger; and (4) prepare the Proxy Statement in connection with the merger.

16.   Jenkens/Weinstock had not previously represented a New Jersey corporation in a transaction similar to the Subchapter S conversion of Amboy.

17.   Jenkens did not retain local New Jersey counsel in connection with Amboy's Subchapter S conversion.

18.   On or about June 23, 1997, BAG made a proposal to Amboy for the "fair market evaluation of minority blocks of common stock" to be used "in connection with a proposed corporate reorganization whereby the number of Amboy shareholders will be reduced thereby making Amboy eligible to potentially elect Subchapter S status."

19.   BAG represented that it is "especially knowledgeable with regard to valuation theory and the rulings and guidelines of the Internal Revenue Service and the Office of the Comptroller of the Currency involving valuation methodology, and judicial decisions regarding bank stock valuation matters."

9

20. BAG further represented that it "will employ all of the valuation methodologies and techniques that are appropriate considering the circumstances of this appraisal."

21. On or about July 8, 1997, Amboy executed an engagement letter prepared by BAG, whereby BAG agreed to "review the financial condition of Amboy Bancorporation, Old Bridge, New Jersey, for the purpose of rendering an opinion as the fair market value of the organization's common stock as of June 30, 1997, for use in connection with a proposed corporate reorganization whereby the number of Amboy shareholders will be reduced thereby making Amboy eligible to potentially elect Subchapter S status."

22. BAG rendered its Cash Fair Market Evaluation ("Valuation Report"), dated August 15, 1997, using financial data through June 30, 1997, and concluded that the "cash fair market value" for the shares of Amboy stock as of June 30, 1997, was $69.50 per share.

23. BAG utilized a Market Value approach as its primary method of valuation, first arriving at $82.00 per Amboy share, to which BAG applied a 15% marketability discount to arrive at the value of $69.50.

24. Amboy's Board of Directors relied on the $69.50 valuation in determining and approving a price of $73.00 per share to be paid to its shareholders in connection with the Subchapter S conversion.

25. Amboy needed to be prepared to cash out 750,000 shareholders at a per share value of $73.00, for a total of $54,750,000.

26. Thereafter, BAG issued a Fairness Opinion as to the value of $73.00 per share.

27. Jenkens prepared the Proxy Statement in connection with the Subchapter S conversion.  The Proxy Statement incorporated portions of BAG'S Valuation Report.

28. The Proxy Statement intermittently referenced the standard of "cash fair market value", "fair value" and "fair market value" when referring to the value of Amboy shares.

10

29.  As initially drafted, the Proxy Statement made no allowance for dissenters' rights.  Shortly prior to publication of the Proxy Statement, Jenkens advised Amboy that Jenkens now believed that the Subchapter S conversion had to provide for dissenters' rights. Jenkens drafted an addition to the Proxy Statement, which was inserted as page 47.

30.  As finally drafted, the Proxy Statement provided that shareholders with 15,000 or more shares could obtain dissenters' rights, which entitled them to "fair value" for their shares. Other shareholders were incorrectly advised that they were entitled to receive "Cash Consideration" of $73.00 cash per share, which according to BAG is the "cash fair market value" of Amboy's shares.  *Id.* at 35, 47.

31.  On or about October 24, 1997, Amboy sent a Notice of Special Meeting and Proxy Statement to the shareholders, scheduling a shareholders' meeting for November 19, 1997.

32.  The special meeting was contentious at times.  Several of the shareholders attending the November 19, 1997 meeting were accompanied by attorneys who questioned the Subchapter S conversion.

33.  After debate, the shareholders approved the plan of merger.

34.  On or about November 28, 1997, Amboy advised Jenkens that one shareholder, John Everitt, was soliciting other shareholders to sue Amboy.

35.  Ultimately, the Subchapter S conversion required Amboy to cash out approximately 625,000 shareholders at a per share value of $73.00, for a total of $45,625,000. The main source of capital to fund the repurchase of Amboy shares was a dividend from Amboy Bank, the operating subsidiary of Amboy Bancorporation. Such a large dividend exceeded the ratios permitted by federal banking regulations, and Amboy had to secure the permission from the District Comptroller of the Currency to exceed the ratios by $8 million.

36.  Amboy consummated the merger (Subchapter S conversion) on December 2, 1997.

11

83846451.1

37.   On December 2, 1997, Amboy filed a Certificate of Merger with the Secretary of State and the merger (Subchapter S conversion) became effective.

38.   As set forth by Jenkens in the Proxy Statement, "[t]he Merger is not expected to have any impact on the day-to-day operations of the Bank [Amboy Bank]."

39.   Prior and subsequent to the Subchapter S conversion, the Bank operated under the "day-to-day management of its own officers, and the Bank's board of directors formulates its own policies with respect to banking and business matters."  The officers and directors of the Bank remained the same prior and subsequent to the Subchapter S conversion.

40.   In the Special Considerations section of the Proxy Statement, Jenkens specifically provided that: "the Surviving Company [Amboy Bancorporation] will be a one-bank holding company engaged in the business of managing, controlling and operating the Bank [Amboy Bank]. . . . "  "As such, the profitability of the Company is, and that of the Surviving Company will be, directly and wholly attributable to the success of the Bank."

41.   According to the Proxy Statement: "The exact amount of future dividends on the stock of the Bank will be a function of the profitability of the Bank in general and applicable tax rates in effect from year to year.  The Bank's ability to pay dividends in the future will directly depend on the Bank's future profitability, which cannot be assured."

42.   The Subchapter S conversion provided no guarantees to the remaining shareholders with respect to the payment of dividends.

**The Underlying Class Action**

43.   On December 5, 1997, plaintiffs Casey and Gagliano commenced an action against Amboy and the individual members of its Board of Directors.  On December 17, 1997, the trial court denied Plaintiffs' application to temporarily restrain Amboy from taking further action to consummate the merger.

44.   The Subchapter S conversion of the Bank thereafter led to a class action litigation by its shareholders against Amboy

12

83846451.1

entitled *Casey v. Brennan, et al.*, Docket No. UNN-C-180-97, in the Superior Court of New Jersey, Chancery Division, Union County.

45.   On January 29, 1998, after the approval of the Subchapter S conversion, plaintiffs DeSanctis and Everitt filed a class action litigation in the Superior Court of New Jersey on behalf of the class representative and those similarly situated as minority shareholders, seeking damages related to the transaction in which Amboy Bancorporation converted to a Subchapter S corporation.

46.   Thereafter on March 4, 1998, Thomas Morrissey commenced a class action litigation in the Superior Court of New Jersey on behalf of himself and others similarly situated also seeking damages related to the transaction through which Amboy Bancorporation converted to a Subchapter S corporation.

47.   Jenkens represented Amboy as lead counsel in the underlying litigation until December 7, 1998, at which time it withdrew as counsel.

48.   Walters testified at trial that regarding instructions on the standard of value under New Jersey law: "we do rely on the bank's attorneys to tell us what quote/unquote "language" to use, what words to use as it regards value. And in this case, they [Jenkens] gave us no instructions, and in the absence of any instructions, we use fair market value."

49.   "Cash fair market value" is a standard unknown in New Jersey.

50.   New Jersey has used "fair value" since at least 1969. As initially drafted, the Proxy Statement made no allowance for dissenters' rights.

51.   Shareholders received their checks from Amboy on or about January 7, 1998, as required by law.   Amboy printed the language "FULL AND FINAL PAYMENT @ $73.00 PER SHARE TO HOLDERS OF RECORD 12/2/97" on the checks on the advice of Jenkens.

52.   Jenkens advised Amboy that if the shareholders cashed the checks with this legend (above), they would not be able to challenge the transaction.

13

53.  All shareholders except six (6) accepted the tendered price of $73.00 per share.  Plaintiffs in the underlying action, Casey and Gagliano are two of the six shareholders who did not accept the tendered price.

54.  While representing Amboy as lead counsel in the underlying class action litigation, Jenkens took the position that two different standards of value applied to the shares (i.e., the dissenting shareholders were entitled to "fair value" and the non-dissenting shareholders were entitled to "fair market value"). In a memorandum, Jenkens attempted to reconcile its position on valuation: "Our first position should be that fair market value is the correct inquiry since the dissenters were not entitled to appraisal rights and, therefore, the statutory "fair value" standard is not implicated."

55.  In the shareholder litigation, Jenkens acted as lead defense counsel from December 1997 to December 1998.  Jenkens advised Amboy that there was nothing wrong with the Proxy Statement, and that the litigation should be vigorously defended. Jenkens withdrew as counsel when it advised Amboy that it had a conflict of interest because the shareholders took the position that the proxy statement drafted by Jenkens was misleading.

56.  Jenkens advised Amboy by letter dated July 9, 1998 of the "potential for a conflict of interest" based on the allegations by plaintiffs that the disclosures in connection with the Subchapter S conversion were inadequate and that Jenkens prepared the Proxy Statement containing the disclosures.

57.  By letter dated July 9, 1998 Jenkens further advised Amboy that "We, of course, believe that the Proxy Statement our firm prepared is more than adequate to inform all shareholders of all information material to their decision concerning the merger ...."

58.  On October 12, 1998, Jenkens wrote Amboy: "As you know, many of the members of the Plaintiff class voted in favor of the transaction. In an effort to escape the preclusive effect of these votes, these Plaintiffs have alleged that the Proxy Statement was misleading and failed to make disclosure of all material information. If these claims were to be successful, Amboy and the other Defendants might consider making a claim for legal malpractice against Jenkens & Gilchrist because our lawyers drafted the Proxy Statement. As you know, Peter and I are of the

14

opinion that the Proxy Statement disclosed all material information and that the Plaintiffs' claims to the contrary are meritless."

59.   Amboy relied on the advice of Jenkens throughout the course of Jenkens' representation of Amboy in connection with the Subchapter S conversion and the litigation.

60.   At no time during the consummation of the conversion did Jenkens advise Amboy of the risk of a post-merger class action litigation in which the cashed out shareholders could seek a per share value far exceeding the $73.00 per share price arrived at for Amboy stock.

61.   Had Amboy been properly advised by counsel of the potential for a post-closing class action suit, it would not have proceeded with the Subchapter S conversion and would have explored other options.

62.   Despite a direct request by BAG for guidance, Jenkens failed to instruct BAG as to the legally required standard of value in New Jersey. Failing any guidance from Jenkens, BAG employed a legally improper "cash fair market value" standard.

63.   Amboy's financial performance is unrelated to the Subchapter S conversion.

64.   Amboy could have achieved Subchapter S status without incurring damages related to Jenkens' legal malpractice.

**The Trial Court's Decision**

65.   On April 26, 1999 the trial court in *Casey v. Brennan* rendered its decision. The trial court entered an Order of Judgment on May 18, 1999.  The trial court divided the class into two sub-classes: (1) shareholders who accepted the merger consideration and voted in favor or abstained from voting as well as those who voted against the merger and did not cash the check for the merger consideration ("Recovering Shareholders"); and (2) shareholders who accepted the merger consideration and voted against the merger ("Non-recovering Shareholders").  The former recovered $90.00 per share, while the latter recovered nothing.

15

66. The trial court in *Casey v. Brennan* also determined that the Proxy Statement contained misleading statements of material facts and failed to disclose all material facts.

67. Specifically, the trial court found that the Proxy Statement: (1) failed to disclose the use of a 15% marketability discount; (2) failed to disclose the unadjusted value of $82.00 per share; (3) failed to disclose the $110.00 value per share acquisition value; (4) relied on stale financial data; and (5) utilized the improper standard of "cash fair market value" as opposed to the legally required standard of "fair value."

68. The trial court in *Casey v. Brennan* held the Bank liable to holders of approximately 400,000 shares of stock who relied on the Proxy Statement and voted in favor of the merger (Subchapter S conversion).

69. After the first judgment against Amboy was entered, Amboy offered to settle the shareholder litigation by allocating responsibility between Jenkens and Amboy. Counsel for Jenkens, Edward Deutsch, refused Amboy's offer, resulting in continued litigation.

## The Appellate Court's Decision

70. The Appellate Court in *Casey v. Brennan* determined that because the Proxy Statement was materially misleading, the other approximate 207,000 (Non—Recovering) shareholders who did not rely on the Proxy Statement and voted against the merger (Subchapter S conversion) were not estopped from recovery, as they were not fully informed.

71. The Appellate Division remanded the matter for the trial court to consider the effect of a control premium for Amboy's value.

72. On remand from the Appellate Division, the Chancery Court found Amboy liable in the amount of $27.00 per share, representing the difference between the $73.00 per share price and the "fair value" determination of $100.00 per share on 625,698 shares. The first remand determination resulted in a judgment against Amboy of $16,893,846, together with interest of $4,245,820, attorneys' fees and expenses of the statutory dissenter's counsel in the amount of $199,958.15, for a total of $21,339,624.00, which amounts Amboy paid.

16

73.  The Plaintiffs appealed the first remand decision.  On June 26, 2003, the Appellate Division reversed the first remand decision on procedural grounds and again remanded the matter to the trial court to determine the fair value of Amboy's shares in accordance with its instructions set forth in *Casey I*.

**The Final Decision**

74.  On July 16, 2004, the trial court rendered its written opinion on the second remand, finding the fair value of Amboy shares to be $114.00 and entered it Final Judgment on August 30, 2004.

75.  All parties appealed the decision on the second remand. The Appellate Division affirmed the trial court's decision finding the fair value of Amboy shares to be $114.00.

76.  Amboy paid the Final Judgment dated August 30, 2004. In total Amboy paid the following amounts in damages in the underlying class action: 1) Class Plaintiffs: $31,433,613.42; 2) Statutory Dissenter, Susan Hermanos: $1,385,698.79; and 3) Plaintiffs Casey and Gagliano: $614,614.31.

77.  Amboy incurred $1,758,590.87 in attorneys' fees to defend the underlying class action litigation.  Amboy also paid Jenkens $162,065.64 and BAG $43,000 in fees related to the Subchapter S conversion.

78.  Amboy incurred substantial attorneys' fees to defend its Board against claims based on breach of fiduciary duty.  The trial court found that pursuant to N.J.S.A. 14A:6-14, Amboy's Board of Directors relied in good faith on its financial expert (BAG) and on counsel (Jenkens) in arriving at $73.00 per share.

79.  The misleading and deficient Proxy Statement that Jenkens prepared was the proximate cause of the harm suffered by Amboy.

80.  Jenkens failed to know, understand and utilize the correct standard of valuation required under New Jersey law; failed to advise Amboy of the shareholders' right to challenge the Subchapter S conversion and failed to advise Amboy of the magnitude of the potential risk associated with a class action litigation.

81.  Jenkens failed to appropriately supervise associates working on Amboy's Subchapter S conversion.

82.  BAG used stale data in its valuation of Amboy's stock and failed to know, understand and utilize the correct standard of valuation required under New Jersey law.

83.  Amboy incurred damages in the amount of $35,397,583.03, which damages were proximately caused by the negligent acts/omissions of Jenkens and BAG.

84.  The BAG engagement letter required that Amboy provide to BAG true and accurate information regarding Amboy's finances and assets to assist BAG in its valuation of Amboy's stock.

85.  The BAG engagement letter also included an indemnification clause whereby Amboy agreed to indemnify BAG if Amboy provided incorrect or inaccurate financial information.

86.  The indemnification clause provided:

> in connection with the subject valuation and any and all future valuation updates, covenants and agrees to indemnify and hold harmless The Bank Advisory Group, Inc., the officers, directors, employees and shareholders of The Bank Advisory Group, Inc. and assigns, heirs, beneficiaries and legal representatives of each indemnified entity and person from and against any and all damage, loss, cost, expense, obligation, claim or liability, including attorneys fees and expenses, suffered by any indemnified person or persons as a result of any breach of the foregoing representations, warranties, and understandings, or as a result of delivery or disclosure to The Bank Advisory Group, Inc. of proprietary or confidential information, assuming The Bank Advisory Group, Inc. and its employees treat such information in a confidential manner.

87.  In the Fairness Opinion, BAG states: "the price of $73.00 per share extended to shareholders of [Amboy] in

18

connection with the Purchase Right, is fair, from a financial standpoint, to all shareholders of [Amboy], including those shareholders exercising the Purchase Right."

88.   BAG admits that its analysis "must be considered as a whole and that selecting portions of such analysis and the factors considered therein, without considering all factors and analysis, could create an incomplete view of the analysis and the processes underlying the Fairness Opinion."

89.   Despite BAG's issuance of a Cash Fair Market Evaluation, neither the Proxy Statement nor the Fairness Opinion refer to "cash fair market" value (or even use the term).

90.   BAG admittedly did not know what New Jersey's standard was for valuing stock.

91.   BAG worked with Jenkens to draft the Proxy Statement and had opportunities to review and comment on the accuracy and content of the draft proxy statements.

92.   BAG failed to identify inaccurate and/or misleading information relating to its valuation and failed to include material information regarding its cash fair market valuation.

93.   The final draft of the proxy statement was not reviewed by Walters, but rather was reviewed by his colleague Steven Skaggs.

94.   Amboy relied on BAG's evaluation and consummated the merger on December 2, 1997.

95.   With respect to BAG, the trial court found that:

> A.   Through Walters, the bank's financial expert, they failed to identify or calculate the percentage for minority/illiquidity discounts and overall used a fair market value approach instead of a legally required fair value.
>
> B.   Through Walters, as their expert, failed to identify and describe the misuse of data that was stale in his calculations.  By using a June 30th, 1997 date evaluation rather than, at least, a September 30th, 1997 date, he used

19

outdated information that could have affected
at least one of his approaches to value.

The testimony has been, however, that Walters
did not request the September 30th, 1997
financial statement from the bank.

\* \* \*

The misleading and inaccurate information
supplied in the proxy as to value was not
knowingly contained therein by any of the
individual directors.   The only evidence is
that they relied upon the expertise of
Walters who recommended a $70 per share value.

### Jenkens' (Defendant) Contested Facts:

1.   The early- and mid-1990s was a period of consolidation
in the banking industry, during which many small community banks
were acquired by larger national banks or otherwise went out of
existence.

2.   Amboy Bancorporation ("Amboy") wished to remain an
independent community bank.   In an effort to continue in
existence Amboy adopted a strategic plan requiring that it
maintain a return on equity of at least 15 per cent.

3.   Amboy was generating more capital than it could
profitably put to use, causing its return on equity to drop to a
level inconsistent with its long-term objectives.

4.   Amboy on three occasions in the mid-1990s attempted to
put its excess capital to use by acquiring other banks.   Each of
those attempts was unsuccessful.

5.   Amboy also attempted to use its excess capital to buy
back the stock of its shareholders.   It sent a letter to its
shareholders in July 1996 offering to buy back their stock, but
received little response to that offer.

6.   Amboy could have alleviated its excess capital problem
by making cash distributions to its existing shareholders, but
chose not to do so.   Because Amboy was a Subchapter C corporation,
any such distributions would have been subject to double taxation,

20

once at the corporate level and again at the individual shareholder level.

7.   In 1996 Congress passed legislation that for the first time permitted bank holding companies to elect Subchapter S status.  Subchapter S corporations are not taxed at the corporate level, only at the shareholder level.

8.   At that time, in order to be eligible to elect Subchapter S status, a corporation could have no more than 75 eligible shareholders.   Only individuals were eligible to own shares of stock in a Subchapter S corporation.   Amboy had approximately 420 shareholders, among whom were some corporations and trusts.

9.   In the Fall of 1996 George Scharpf, Amboy's president and chief executive officer, attended a meeting of the Bank CEO Network held in Nantucket.   Among the programs at that meeting was a presentation by The Bank Advisory Group, Inc. ("BAG") and Jenkens & Gilchrist ("J&G") relating to the process and potential benefits for a bank holding company of converting to a Subchapter S corporation under the new federal legislation.   Bob Walters presented on behalf of BAG and Peter Weinstock on behalf of J&G.

10.   Scharpf had known Walters for approximately 20 years through their mutual participation in the Bank CEO Network. Scharpf and Walters had previously discussed the subject of corporate transactions involving the involuntary removal of smaller shareholders by buying back their shares.   Walters had explained to Scharpf that many state courts, led by Delaware, were moving toward disallowing the use of valuation discounts in connection with such "squeeze-out" transactions.   The two men also discussed the likelihood that if Amboy attempted to remove smaller shareholders the removed shareholders most likely would sue Amboy.

11.   In February 1997 Scharpf invited Walters to make a presentation to Amboy's board of directors concerning available methods of reducing Amboy's excess capital.

12.   On April 16, 1997, Walters made a presentation to Amboy's Board of Directors.   He included discussion of a variety of options for reducing capital, among which were the buy-back of shares by means of a Dutch auction, a reverse stock split, and a merger and reorganization as an S corporation.   During that

21

meeting Walters was questioned by Harold Smith, an attorney and board member, as to the likelihood of Amboy being sued if it engaged in an involuntary stock repurchase. Walters advised the Board that litigation was a virtual certainty.

13.   Amboy subsequently concluded that it should engage in a corporate reorganization whereby ineligible shareholders would be involuntarily eliminated and the number of Amboy shareholders would be reduced to a level allowing for the election of Subchapter S status. Amboy decided that other options for addressing its excess capital problem, including a Dutch auction, reverse stock split, and tender offers to reacquire shares, were not feasible.

14.   George Scharpf was aware of legislation proposed by the Clinton administration that would undermine the tax advantages of electing Subchapter S status by imposing immediate gain recognition on both the corporation (with respect to appreciated assets) and shareholders (with respect to their stock). Accordingly, he wanted Amboy to be in a position to make a Subchapter S election by the end of 1997, prior to any change in the law.

15.   In June 1997 Amboy retained BAG for the purpose of preparing a fair market evaluation of minority blocks of Amboy's common stock to be repurchased in conjunction with the proposed corporate reorganization.

16.   In July 1997 Amboy retained J&G for the legal aspects of the proposed reorganization and Subchapter S conversion. Amboy chose Peter Weinstock of J&G because of his experience in handling these kinds of transactions and because no New Jersey lawyer had any experience in the Subchapter S conversion of a bank holding company.

17.   Weinstock and Pamela Gates O'Quinn were the two J&G attorneys primarily involved in working with Amboy on the squeeze-out merger and Subchapter S reorganization.   Their principal contacts at Amboy were George Scharpf and Stanley J. Koreyva, Jr., the chief financial officer of Amboy Bank ("the Bank"), Amboy's wholly-owned operating subsidiary.

18.   During the early stages of the engagement, Weinstock and O'Quinn discussed with Scharpf and Koreyva the state of the law concerning the use of discounts in valuing shares of stock

22

and the risk of litigation concerning the value placed by Amboy on the stock. They explained that New Jersey had not yet addressed the issue of whether discounts could be used but that Delaware did not allow the use of discounts and there was a risk that New Jersey's courts would also reject their use. Scharpf stated that he recognized the risk of litigation and the possibility that discounts would be disallowed. However, he wanted to utilize discounts in order to start at the lowest price possible with the idea that a settlement might then be negotiated if necessary at a higher price.

19. On August 13, 1997, Amboy's Board of Directors met with representatives of KPMG Peat Marwick, Amboy's accountants, and heard a presentation concerning the tax benefits and disadvantages of converting to a Subchapter S corporation.

20. On August 15, 1997, BAG supplied Amboy with its Cash Fair Market Evaluation of the Common Stock of Amboy Bancorporation as of June 30, 1997. The report valued a minority share of Amboy stock at $69.50 per share. BAG arrived at this figure utilizing a number of different valuation methodologies including net asset value, market value, and investment value.

21. By way of confirming its valuation BAG also calculated the per share value of a controlling interest in Amboy stock and applied minority and marketability discounts to that number. BAG determined that a controlling interest in Amboy had a value of $110 per share. It applied a 25% minority discount to this number to arrive at a minority block value of $82.50 per share and then applied a 15% marketability discount to arrive at a figure of $70.13 per share.

22. Scharpf had requested that Walters incorporate the determination of a controlling interest in his valuation as a means of setting an upper limit on the price that Amboy might ultimately have to pay for the shares of stock it was repurchasing. Walters never before had included such a value in his reports but he did so on this occasion as Scharpf had requested.

23. On August 19, 1997, Amboy's Board of Directors met to consider whether to proceed with the squeeze-out merger and Subchapter S conversion and to set the price it would pay for the shares being repurchased. Weinstock and O'Quinn attended this meeting on behalf of J&G but were asked to leave the meeting

before the Board began its discussion concerning the price to be offered to Amboy's minority shareholders.

24.   The Board resolved to go forward with the proposed transaction and set a price of $73 per share for the stock to be repurchased in the squeeze-out merger.

25.   In setting the cash price per share, the Board considered a variety of factors including the price per share paid in recent trades, the price per share then being offered by the market makers in Amboy stock, the BAG valuation report, and the prevailing market prices of financial institution stocks generally.

26.   Amboy intended to use the Bank's excess capital to pay for the buy-back of its stock.   To this end the Bank sought and obtained regulatory approval from the Office of the Comptroller of the Currency for a special $45 million dividend to be paid to Amboy by the Bank.

27.   Amboy did not undertake any kind of analysis to determine whether it would have been financially feasible for it to pay more than $73 per share for the stock it was buying back in the squeeze-out merger or whether the Bank could have obtained regulatory approval for a larger special dividend based on a per share price higher than $73.

28.   Amboy determined that in order to ensure that no more than 75 eligible shareholders would remain following the squeeze-out merger all Amboy shareholders holding fewer than 15,000 shares and all ineligible shareholders would be involuntarily cashed out in the merger.   However, any eligible shareholder having fewer than 15,000 shares would be given the opportunity to increase his or her holdings prior to the merger in the event he or she wished to continue as a shareholder.

29.   J&G prepared a proxy statement to be disseminated to Amboy's shareholders in anticipation of a shareholder meeting during which shareholders would have the opportunity to vote on whether to approve the proposed merger.   The proxy statement was prepared with the assistance of and input from Stan Koreyva on behalf of Amboy and Bob Walters on behalf of BAG.

30.   In conjunction with its preparation of the proxy statement J&G recommended to Amboy that BAG's cash fair market valuation report be attached as an exhibit to the proxy statement

24

in order to provide the fullest disclosure possible and to prevent any squeezed-out shareholders from challenging the transaction by attacking the completeness of the information contained in the proxy statement.   Scharpf rejected this recommendation.

31.   By law Amboy shareholders who were to receive only cash for their stock (all shareholders with fewer than 15,000 shares) had no statutory right to dissent from the merger.   J&G suggested to Amboy that it voluntarily provide statutory dissenter's rights to all shareholders as a means of limiting the bases on which they could challenge the merger.   Scharpf also rejected this recommendation.

32.   BAG, in preparation for rendering an opinion as to whether the price being offered by Amboy was fair, undertook a review of Amboy's recent financials and performed the due diligence necessary to bring current its valuation of Amboy's stock.   It then issued a fairness opinion setting forth its professional view as an appraiser that the price of $73 per share was fair.

33.   BAG's fairness opinion was summarized in the proxy statement and was appended as an exhibit.   The proxy statement also stated that BAG's valuation report was available at the Bank for review by any interested shareholder.

34.   The proxy statement and fairness opinion were sent to Amboy's shareholders on October 24, 1997 along with notice that the shareholders' meeting to vote on the proposed transaction would be conducted on November 19, 1997.

35.   At least one Amboy shareholder, John Everitt, went to Amboy's offices prior to the shareholders' meeting to review the valuation report of BAG.

36.   Prior to the shareholders' meeting Amboy received several letters from shareholders or attorneys representing shareholders expressing displeasure with the proposed transaction and with the price being paid for their stock.

37.   At the time of the shareholders' meeting there were 3,166,008 shares of Amboy common stock issued and outstanding. Of the total number of outstanding shares, 575,968 (18.2%) were owned by shareholders with fewer than 15,000 shares.   Amboy's by-

83846451.1

laws required that the merger be approved by a two-thirds (2/3) majority of the votes cast at the shareholder meeting.

38.   On November 19, 1997, Amboy's shareholders met and approved the proposed merger.   There were 2,480,986 votes in favor, 426,043 votes against, and 258,979 abstentions.   Of the shares owned by shareholders with 15,000 shares or more, 2,115,721 voted in favor.   This equaled 66.8% (more than two-thirds) of all the outstanding shares of Amboy common stock and 72.8% of all shares voted.

39.   On November 24, 1997, Amboy shareholder John Everitt sent a letter to all Amboy shareholders holding fewer than 15,000 shares stating his view that the price of $73 per share was unconscionably low, advising that he had retained counsel to consider filing litigation, and soliciting funds from other shareholders for that purpose.   Amboy's management was aware of this effort prior to the effective date of the merger.

40.   Only a few shareholders holding less than 15,000 shares sought to avail themselves of the opportunity to buy up to the 15,000 share level in order to remain an Amboy shareholder. Koreyva, the Bank's CFO, was one of them.   He obtained a personal loan from Scharpf in order to provide the necessary funding for his purchase of additional shares.

41.   On December 2, 1997, Amboy filed a Certificate of Merger with the New Jersey Secretary of State, finalizing the squeeze-out merger transaction and reducing the number of Amboy's shareholders from 420 to 51.

42.   On December 5, 1997, Kathryn Casey and Sheila Gagliano, two of Amboy's squeezed-out shareholders, filed suit against Amboy and the individual members of its Board of Directors in the Superior Court of New Jersey, Chancery Division, Union County, seeking to enjoin or rescind the merger and to obtain fair value for their shares.   Two related lawsuits were subsequently filed and were consolidated with the Casey matter.

43.   Susan Hermanos, an Amboy shareholder who owned more than 15,000 shares, exercised her statutory right to dissent from the transaction and subsequently intervened in the Casey litigation in order to pursue her statutory right to a determination of fair value.

44. On December 8, 1997, during a telephone conference with Peter Weinstock and Charles Gall of J&G concerning the lawsuit filed by Casey and Gagliano, George Scharpf of Amboy rejected Weinstock's recommendation that Amboy consent to an injunction staying implementation of the merger pending the outcome of the valuation litigation. Mr. Scharpf was insistent that Amboy be able to elect Subchapter S status before the end of 1997 so as to take full advantage of the tax benefits of that election before any change in the law.

45. Amboy made its election of Subchapter S status on December 30, 1997, effective as of January 1, 1998.

46. On January 7, 1998, Amboy sent a check in an amount equal to $73 for each share held to all of its former shareholders who were being cashed out. Amboy cashed out 625,698 shares at a total cost of $42,625,000. Approximately 369 of Amboy's 420 shareholders were "squeezed out" in the process.

47. In the shareholder suit Amboy took the position through its present counsel, Dennis T. Kearney, that the proxy statement was accurate and complete, that $73 per share was a fair price, that the squeezed-out shareholders were not entitled to a greater price, that discounts were appropriate in computing fair price, and that the methods used to calculate value were in conformity with the law.

48. On April 29, 1999, the trial court in the Casey litigation rendered its decision finding that the fair value of Amboy stock as of the day before the shareholder vote approving the merger was $90 per share and that former shareholders who had voted in favor of the merger or had voted against it and refused to accept payment for their shares were entitled to receive the additional amount. The court held that Amboy's former shareholders who had voted against the merger but had accepted payment for their shares had acquiesced in the transaction and therefore were not entitled to any additional payment beyond $73 per share. Both sides appealed.

49. On July 14, 1999, the New Jersey Supreme Court decided two cases, Balsamides v. Protameen Chemicals, 160 N.J. 352 (1999), and Lawson Mardon Wheaton, Inc. v. Smith, 160 N.J. 383 (1999), in which it addressed for the first time the question whether minority and marketability discounts could be used in valuing shares of stock in the context of certain corporate transactions.

27

The court determined that, in most circumstances, the use of such discounts was prohibited.

50. On August 1, 2001, the Appellate Division rendered a decision in the Casey appeal in which it held that all of Amboy's squeezed-out shareholders were entitled to be paid fair value for their shares. It also reversed the trial court's determination of fair value and remanded the matter back to the trial court for further proceedings consistent with its opinion. Casey v. Brennan, 344 N.J. Super. 83 (App. Div. 2001).

51. On February 27, 2002, at the conclusion of the second trial of the Casey matter, the trial court found that the fair value of Amboy stock as of the day before the shareholder vote approving the merger was $100 per share. A second appeal followed.

52. On June 26, 2003, the Appellate Division again set aside the trial court's determination of fair value and remanded the Casey matter back to the trial court for further proceedings.

53. On July 16, 2004, at the conclusion of the third trial of the Casey matter, the trial court found that the fair value of Amboy stock as of the day before the shareholder vote approving the merger was $114 per share. A third appeal followed.

54. On August 10, 2006, the Appellate Division rendered its decision affirming the judgment of the trial court. The New Jersey Supreme Court denied certification, thus ending the shareholder litigation.

55. While the second appeal in Casey was pending Amboy made a payment to all its squeezed-out shareholders equal to the difference between the $100 per share value as found by the court and the $73 per share price originally paid.

56. In 2007 Amboy made a further payment to all its squeezed-out shareholders equal to the difference between the $114 per share value as finally determined in the shareholder litigation and the $100 per share price previously paid.

57. Immediately after its conversion to a Subchapter S corporation Amboy experienced a dramatic improvement in its earnings, cash dividends, return on average equity, and return on average assets.

58.  George Scharpf in his letter to shareholders that accompanied Amboy's 1998 Annual Report attributed Amboy's improved performance to its conversion to a Subchapter S corporation.

59.  In the first year after its Subchapter S election Amboy made distributions to its remaining shareholders totaling $11.00 per share compared to distributions of $1.20 per share in the previous year.

60.  Altogether, between 1998 and 2005 Amboy distributed a total of $135.50 per share to its remaining shareholders. Accordingly, each remaining Amboy shareholder having a minimum of 15,000 shares has received at least $2,032,500 in distributions (pre-tax) since the Subchapter S conversion.  Between 1998 and 2005 George Scharpf, Amboy's largest shareholder, never owned fewer than 429,422 shares in his own name and personally received in excess of $58 million in distributions during this period.

61.  Between 1998 and 2005 the price per share established annually by Amboy for the shares of stock owned by its Employee Stock Option Plan (ESOP) increased from $75.02 per share in 1998 to $151.00 per share in 2005.

62.  At all times between 1998 and 2005 the Bank has maintained capital ratios in excess of the levels set by federal banking regulators for well-capitalized institutions.

63.  At all times between 1998 and 2005 the Bank has maintained a CAMEL 1 rating, the highest rating given for banks by federal regulators.  (CAMEL is an acronym for capital, assets, management, equity and liabilities.)

64.  Amboy had the financial capacity in 1997 to undertake the squeeze-out merger at a price of $114 per share.

65.  Amboy has not been damaged by virtue of its having to pay $114 per share for the stock of its squeezed-out shareholders.

66.  The return on investment enjoyed by Amboy on the amounts in excess of $73 per share that it retained prior to paying the judgments in the Casey litigation more than offset the accrued interest on the judgment amounts and the litigation costs incurred by Amboy.

**BAG's (Defendant) Contested Facts:**

A.   Bank Restructuring and Retention of J&G and BAG

     Plaintiff is a New Jersey based community bank. Plaintiff
was incorporated as a New Jersey corporation in April 1984 to
serve as a bank holding company.   In or about October 1996,
Plaintiff retained J&G to prepare a proxy statement in connection
with its effort to convert Plaintiff into a Subchapter S
corporation pursuant to 26 U.S.C. § 1361.   In order to qualify
for Subchapter S status, it was necessary for Plaintiff to reduce
its shareholder base to less than seventy-five qualified
shareholders from approximately the 420 shareholders it had in
1996.

     On or about July 8, 1997, Plaintiff entered into a retainer
agreement (the "BAG Agreement") with BAG, pursuant to which BAG
agreed to "review the financial condition of Amboy Bancorporation,
Old Bridge, New Jersey, for the purpose of rendering an opinion
as to the fair market value of the organization's common stock as
of June 30, 1997, for use in connection with a proposed corporate
reorganization whereby the number of Amboy shareholders will be
reduced thereby making Amboy eligible to potentially elect
Subchapter S status."

     The BAG Agreement contains an indemnification provision
pursuant to which Plaintiff agreed to indemnify and hold BAG
harmless against, among other things, attorneys' fees and
expenses incurred by BAG arising out of the services it was
performing for Plaintiff.   The subject indemnification provision
reads as follows:

          "In connection with our engagement of your
          firm to perform these services, Amboy
          Bancorporation for itself, its
          subsidiaries, and affiliates and its and
          their respective successors and assigns,
          hereby:   (i) represents and warrants to
          The Bank Advisory Group, Inc. that nay
          information furnished or to be furnished
          to The Bank Advisory Group, Inc. by or on
          behalf of Amboy Bancorporation in
          connection with this engagement is true
          and accurate in all material respects and
          does not contain any untrue statement of a

83846451.1

material fact or omit a material fact
necessary to make the information not
misleading; (ii) acknowledges and
understands that The Bank Advisory Group,
Inc. will not independently verify the
asset quality or financial condition of
any institution the stock of which The
Bank Advisory Group, Inc. is requested to
analyze; and, (iii) in connection with the
subject valuation and any and all future
valuation updates, covenants and agrees to
indemnify and hold harmless The Bank
Advisory Group, Inc., and assigns, heirs,
beneficiaries and legal representatives of
each indemnified entity and person from
and against any and all damage, loss, cost,
expense, obligation, claim or liability,
including attorneys' fees and expenses ,
suffered by any indemnified person or
persons as a result of any breach of the
foregoing representations, warranties, and
understandings, or as a result of delivery
or disclosure to The Bank Advisory Group,
Inc. of proprietary or confidential
information, assuming The Bank Advisory
Group, Inc. and its employees treat such
information in a confidential manner."

The foregoing indemnification provision forms the basis for
BAG's counterclaim against the Plaintiff in this case. BAG seeks
to recover all attorneys' fees and expenses incurred in defending
this case pursuant to its indemnification counterclaim herein.

BAG concluded that the "cash fair market value" for Plaintiff's
stock was $69.50 per share. Plaintiff relied on this valuation
in determining and approving a price of $73.00 per share to be
paid to its shareholders in connection with the Subchapter S
restructuring. Previously, Plaintiff's Board of Directors (the
"Board") considered and rejected an $81.00 proposal. While J&G
represented Plaintiff, Plaintiff presented an analysis which
demonstrated that, at certain price levels, the transaction did
not make financial sense for Plaintiff.

J&G prepared a proxy statement (the "Proxy Statement") for
the Subchapter S conversion, incorporating portions of BAG's

31

valuation report. The Proxy Statement provided that shareholders with 15,000 or more shares enjoyed statutory dissenters' rights, which entitled them to "fair value" for their shares. Those with fewer than 15,000 shares were not entitled to dissenters' rights and would receive $73.00 per share. The Proxy Statement stated that shareholders who were receiving cash did not have the right to dissent from the merger.

The merger was completed on December 2, 1997 and the shareholders received their checks on or about January 7, 1998. J&G advised Plaintiff that, if the shareholders cashed the checks, they would be unable to challenge the transaction.

B.   Underlying Litigation

All shareholders except six accepted the $73.00 share price. Two of these shareholders, Kathryn Casey and Sheila Gagliano, commenced an action against Plaintiff and the individual members of the Board on December 5, 1997.  (The action is hereinafter referred to as "Casey").  Shareholders Carol DeSanctis, John Everitt and Thomas Morrissey also filed actions against Plaintiff. J&G represented Plaintiff as lead counsel in the underlying litigation until December 7, 1998, at which time it withdrew as counsel.  While representing Plaintiff, J&G took the position that two different standards of value should apply to the shares, in that the dissenting shareholders should be entitled to "fair value" and the non-dissenting shareholders should be entitled to "fair market value."  Plaintiff relied on J&G's advice throughout the course of J&G's representation of Plaintiff in connection with the Subchapter S conversion and the litigation.

On April 26, 1999, the Court in Casey rendered its decision. The shareholders that accepted the merger consideration and voted in favor or abstained from voting as well as those who voted against the merger and did not cash the check for the merger consideration ("Recovering Shareholders"), accounting for roughly 400,000 shares, recovered $90.00 per share.  The Court also determined that the Proxy Statement contained misleading statements of material facts and failed to disclose all material facts.  The Court also found that Plaintiff's Board relied in good faith on BAG and J&G in arriving at the $73.00 share price.

On appeal, the Superior Court of New Jersey, Appellate Division found that even those shareholders who voted against the merger and accepted the consideration ("Non-recovering

Shareholders") were not estopped from recovery. Approximately 207,000 shares were held by the Non-recovering Shareholders.

On remand from the Appellate Division, the trial court found Plaintiff liable in the amount of $27.00 per share, representing the difference between the $73.00 share price and the "fair value" determination of $100.00 per share on 625,698 shares. The first remand determination resulted in a $21,339,624 judgment against Plaintiff. Following a second remand from the Appellate Division, on July 16, 2004, the trial court found the fair value of Plaintiff's shares to be $114.00. This raised the amount of damages Plaintiff incurred to $33,433,926.52.

C.   Plaintiff's Action against J&G and BAG

On or about October 3, 2002, Plaintiff commenced this action against J&G and BAG in the Superior Court of New Jersey, Law Division, Middlesex County. The complaint asserts three identical causes of action against each of the defendants: (i) negligence; (ii) breach of contract; and (iii) breach of fiduciary duty. On or about November 13, 2002, J&G removed the action to this Court pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. J&G filed its answer to the complaint on December 3, 2002. BAG filed its answer to the complaint on that same date.


5.   **WITNESSES** (Aside from those called for impeachment purposes, only the witnesses set forth may testify at trial. No summary of testimony is necessary.)

**Amboy's (Plaintiff) Witnesses:**

1.   Stanley J. Koreyva, Senior Vice President and COO, Amboy Bank

2.   George E. Scharpf, President and Chief Executive Officer, Amboy Bank

3.   Harold Smith, Board of Director, Amboy Bancorporation

33

4.   Peggy Dembowski, Secretary and Treasurer of Amboy Bancorporation and Vice President, Cashier and Trust Officer of Amboy Bank

5.   Robert Walters, president of The Bank Advisory Group, Inc.

6.   Peter Weinstock, Esq. former partner/shareholder of Jenkens & Gilchrist

7.   Pamela O'Quinn, Esq. former partner/shareholder of Jenkens & Gilchrist

8.   Michael Blayney, Esq. former associate with Jenkens & Gilchrist

9.   Alan Bromberg, Esq. former partner/shareholder of Jenkens & Gilchrist

10.  Charles A. Gall, former partner/shareholder of Jenkens & Gilchrist

11.  R. Bruce McNew, Taylor & McNew LLP (counsel for class plaintiffs in underlying class action)

12.  Kelly Strange Crawford, Riker Danzig (counsel for Susan Hermanos in underlying class action)

13.  David Strickler, Norris McLaughlin & Marcus (counsel for Kathryn Casey and Sheila Gagliano)

**Jenkens' (Defendant) Witnesses:**

1.   Peter Weinstock

2.   Pamela Gates O'Quinn

3.   Michael Blayney

4.   Alan Bromberg

5.   Judy Gechman

6.   Charles Gall

7.   Robert Walters

34

8.    All persons identified in part 8.B of this Order whose prior testimony may be read into the record.

9.    Dennis T. Kearney

10.   Hon. John M. Boyle, J.S.C. (Ret.)

11.   Hon. Thomas N. Lyons, J.A.D.


**BAG's (Defendant) Witnesses:**

Robert Walters
Steven Skaggs
Peter Weinstock
Pamela Gates O'Quinn
Michael Blayney
Allen Bromberg
Judy Gechman
Charles Gall
Dennis T. Kearny
Judge John M. Boyle
Judge Thomas N. Lyons
George Scharpf
Stanley Koreyva
Christopher Hargrove
Robert Gaughran


6.   **NOTE: LAY OPINIONS** (Counsel's attention is directed to the case of <u>Teen-Ed, Inc. v. Kimball Intern, Inc</u>. 620 F.2d 399 (3rd Cir. 1990) and <u>Asplaundh Mfg. Div. Benton Harbor Engineering</u> 57 F.3d 1190 ( Cir. 1995) . Admissions of opinion testimony under Federal Rule 701 of a kind discussed in the <u>Teen 23 Ed, Inc</u>. and <u>Asplaundh Mfg</u>. Div are required to be identified in this Pre-Trial Order. No lay witness whose testimony is in the form of an opinion qualifying under Federal Rule of Evidence 701 and of the nature described in those cases will be permitted to testify at trial unless listed below with a summary of the proposed opinion attached hereto.)

**Amboy's (Plaintiff) Lay Opinions:**

(A)  Stanley J. Koreyva: Senior Vice President and COO, Amboy Bank:

- Mr. Koreyva will testify regarding Amboy's inability to move forward with a Subchapter S conversion, through a squeeze out merger, at any price.  Specifically, Mr. Koreyva will testify that Amboy would have been unable proceed with the Subchapter S conversion at $114.00 per share.

- Mr. Koreyva will testify regarding the capital ratio requirements of the Office of the Comptroller of the Currency and how the requirements impacted on Amboy's ability to participate in a Subchapter S conversion. Mr. Koreyva will similarly testify as to Amboy's practices with respect to capital ratio requirements in the time frame of 1997, and waiver for a dividend in connection with the Subchapter S conversion.

- Mr. Koreyva will testify as to Amboy's financial condition in response to the report of Z. Christopher Mercer.

- Mr. Koreyva will testify about Amboy's corporate structure as a Subchapter S corporation versus a C corporation and why the Subchapter S conversion had no effect on Amboy's operational performance.

- Mr. Koreyva will testify as to Amboy's ROA on approximately $20,000,000 that Amboy retained use of over a five (5) year period prior to making final damages payments to its former shareholders. Specifically, Mr. Koreyva will testify that a pre-merger ROA of 2% gave Amboy $400,000 per year over five (5) years, which resulted in a $2,000,000 return for Amboy on $20,000,000.  Mr. Koreyva will further testify that a post-merger ROA of 3% gave Amboy $600,000 per year over five (5) years, which resulted in a $3,000,000 return for Amboy on $20,000,000.

- Mr. Koreyva will testify as to the amount of interest that Amboy paid out to its former shareholders in the underlying class action.

83846451.1

(B)   George E. Scharpf: President and Chief Executive
      Officer, Amboy Bank:

•   Mr.   Scharpf   will   testify   regarding   Amboy's
    consideration on a price per share in connection with
    the Subchapter S conversion, and how Amboy's Board
    reached the decision that $81.00 per share, or above,
    would be too high for Amboy to proceed with the merger.

## Jenkens' (Defendant) Lay Opinions:

The deposition testimony that Jenkens & Gilchrist may want
to read into the record includes expressions of opinion by
the following witnesses (with brief summary of opinion and
page-line citations):

(A)   Harold Smith (deposition taken on 6-27-06):   Ownership
      of shares in Amboy Bancorporation is a good investment
      (22-17 to 22-22); Amboy's conversion to a Subchapter S
      corporation has been financially remunerative and was a
      wise move (23-17 to 24-3).

(B)   George Brennan, M.D. (deposition taken on 7-13-06):
      Amboy's conversion to a Subchapter S corporation was in
      the best interest of and was beneficial to Amboy and
      its shareholders (39-16 to 40-9).

(C)   Jonathan   Heilbrunn   (deposition   taken   on   7-13-06):
      Amboy's conversion to a Subchapter S corporation  has
      worked out to the benefit of Amboy and its remaining
      shareholders (30-17 to 31-21).

(D)   Joseph DiSepio (deposition taken on 7-13-06):   Amboy's
      conversion to a Subchapter S corporation was in the
      best interests of the company and its shareholders and
      has been financially rewarding to him as an individual
      shareholder (30-21 to 31-19).

(E)   Frank Kurzawa (deposition taken on 7-26-06):   Amboy's
      conversion to a Subchapter S corporation was beneficial
      to the bank's performance and was a good deal for the
      bank and Amboy's shareholders (39-24 to 40-24).

(F)   Robert O'Donnell (deposition taken 8-23-06):   Amboy's
      conversion to a Subchapter S corporation was a good

83846451.1

deal from his perspective as a shareholder and has been beneficial to Amboy Bank (53-7 to 54-6).

### BAG's (Defendant) Lay Opinions:

Robert Walters will testify that BAG properly appraised the fair market value of Amboy's stock.

In addition, BAG adopts and may utilize the lay opinions set forth by Jenkens in the existing draft Final Pretrial Order previously entered in this case.

7. **EXPERT WITNESSES** (No expert shall be permitted to testify at trial unless identified below and unless a summary of his qualifications* and a copy of his report is attached hereto. The summary shall be read into the record at the time he takes the stand, and opposing counsel shall not be permitted to question his expert qualifications unless the basis or objection is set forth herein.)

_____

*If the parties stipulate to an expert's qualifications, there is no need to attach a summary.

### Amboy's (Plaintiff) Experts:

*Amboy takes the position that it should not be required to stipulate to the qualifications of its experts. _See e.g._, _Espinal v. Arias_, 391 N.J. Super. 49, 58-61 (App. Div. 2007).

(A) Stephen H. Knee: A copy of Mr. Knee's expert report is attached hereto.

Mr. Knee is a graduate of Duke University and New York University School of Law. He is a member of the firm Greenbaum, Rose, Smith & Davis, LLP and is admitted to practice law in the States of New Jersey and New York. He is also admitted to practice law before the United States Supreme Court, the United States Court of Appeals for the Third Circuit, the United States District Court for the District of New Jersey and the United

38

States District Court for the Southern District of New York. Mr. Knee has practiced in the field of corporate law for over thirty-eight years. Mergers and Acquisitions have been a substantial part of his practice for the past twenty-one years.

Mr. Knee is a former Director and now a Director Emeritus of the Business Law Section of the New Jersey State Bar Association and a former chair of that Section. Mr. Knee is a member of the Section of Business Law of the American Bar Association and its Committee on Negotiated Acquisitions where he co-chairs its task force on Acquisitions of Public Companies. He is a former member of the New Jersey Supreme Court Ethics Committee, a former member of the New Jersey Institute for Continuing Legal Education's Curriculum Advisory Committee and a former member of the New Jersey Supreme Court Fee Arbitration Committee.

Mr. Knee is also a founding member of the Inn of Transactional Counsel, a member of the American College of Investment Counsel and the Essex County Bar Association.

Mr. Knee has lectured on many occasions for the New Jersey Institute for Continuing Legal Education and other organizations on various aspects of Mergers and Acquisitions. He is also the author of the Chapter on buying and selling businesses in the New Jersey Practice Series.

(B)  <u>Steven Scott Thel</u>:  A copy of Mr. Thel's expert report is attached hereto.

Mr. Thel graduated from North Texas State University, summa cum laude, with a B.A. in economics. He received his J.D. from Harvard Law School. Mr. Thel is currently the Maurice Wormser Professor of Law at Fordham University in New York City, where he teaches courses in contracts, corporate law and securities regulation. He has taught securities regulation every year since 1985 at the Fordham, Columbia, Cornell and Mississippi law schools. He has also taught courses in corporate finance approximately fifteen times.

Mr. Thel began his career with a United States Court of Appeals clerkship in the Fifth Circuit, and then worked at the Securities & Exchange Commission, Office of the General Counsel, Enforcement & Disclosure Policy as an Attorney Advisor. He was

39

also an associate at Kilpatrick & Cody in Atlanta, Georgia before beginning his lengthy career as a professor of law.

Mr. Thel has been a Public Arbitrator for the New York Stock Exchange since 1989 and a Public Arbitrator for the National Association of Securities Dealers since 1988. He is also a Member of the Subcommittee on Market Regulation and Task Force on Market Manipulation, Federal Regulation of Securities Committee, Section of Business Law of the American Bar Association. He is a manuscript reviewer for Business Lawyer and Aspen Law & Business, and a member of various professional associations.

Mr. Thel has testified as an expert and submitted expert reports, declarations and affidavits on contract law, securities regulation, corporate practice and securities industry practice in various judicial proceedings and arbitrations, and has been retained by the United States to testify as an expert in numerous criminal securities fraud cases and by the SEC to testify in judicial and administrative cases.

Mr. Thel has written numerous articles, essays, commentary and reviews on securities regulation. He is also co-author of a book on Investment Management Law & Regulation with Harvey Sines.

**Jenkens' (Defendants) Experts:**

(A)   Robert A. Schwartz, Esq.

Robert Schwartz is an attorney-at-law of the State of New Jersey and is a member of the law firm of Windels Marx Lane & Mittendorf, LLP, with offices in New Brunswick.  He graduated from Fordham University School of Law in 1988 and was admitted to practice in the State of New Jersey that same year.  He is also admitted to practice in the State of New York.  Mr. Schwartz has practiced in the fields of merger and acquisition law, bank regulatory law, securities law and general corporate counseling, including acting as counsel to boards of directors, throughout his entire legal career.  A large portion of his practice consists of counseling community-based financial institutions in corporate transactions, such as purchases and sales, shareholder communications and corporate governance.

(B)   <u>Z. Christopher Mercer, ASA, CFA</u>

       Chris Mercer is the founder and chief executive officer of Mercer Capital, a business valuation and investment banking firm serving a national and international clientele, with headquarters in Memphis, Tennessee.  He holds a masters degree in economics from Vanderbilt University.   Mr. Mercer began his valuation career in the late 1970s.  He has been designated as an Accredited Senior Appraiser by The American Society of Appraisers and as a Chartered Financial Analyst by The CFA Institute.

       Mr. Mercer has prepared, overseen or contributed to hundreds if not thousands of valuations for purposes related to merger and acquisition, litigation, and tax, among others.  He has broad industry experience providing corporate valuation and investment banking services to hundreds of companies in an array of industries, including financial institutions.  Mr. Mercer has also written extensively on valuation-related topics and is a frequent speaker on business valuation issues for national professional associations and other business and professional groups.

    **BAG's (Defendant) Experts:**   None.  BAG reserves the right to challenge testimony submitted by other experts.

    8.   **DEPOSITIONS** (List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy between counsel must be eliminated.  Deposition testimony to be used solely for impeachment purposes need not be listed.)

**Amboy's (Plaintiff) Deposition Designations:**

    (A)  Deposition transcript of Pamela G. O'Quinn ("O'Quinn Tr."), taken on April 6, 2005:

| | |
|---|---|
| O'Quinn Tr. | 7:12-11:3 |
| O'Quinn Tr. | 11:16-13:6 |
| O'Quinn Tr. | 13:11-21 |
| O'Quinn Tr. | 14:8-21 |
| O'Quinn Tr. | 20:24-21:20 |
| O'Quinn Tr. | 24:4-26:6 |
| O'Quinn Tr. | 33:10-19 |

```
O'Quinn Tr.    37:20-38:1
O'Quinn Tr.    40:23-41:3
O'Quinn Tr.    49:21-50:13
O'Quinn Tr.    53:5-11
O'Quinn Tr.    60:11-18
O'Quinn Tr.    77:12-78:1
O'Quinn Tr.    78:8-79:16
O'Quinn Tr.    80:3-82:15
O'Quinn Tr.    86:4-87:10
O'Quinn Tr.    89:6-90:13
O'Quinn Tr.    91:18-94:3
O'Quinn Tr.    94:6-12
O'Quinn Tr.    94:18-95:5
O'Quinn Tr.    95:9-19
O'Quinn Tr.    99:21-101:11
O'Quinn Tr.    103:10-23
O'Quinn Tr.    111:14-17
O'Quinn Tr.    113:23-114:14
O'Quinn Tr.    115:2-117:15
O'Quinn Tr.    119:14-120:1
O'Quinn Tr.    121:14-17
O'Quinn Tr.    122:25-123:10
O'Quinn Tr.    123:23-124:14
O'Quinn Tr.    127:21-129:15
O'Quinn Tr.    129:17-130:15
O'Quinn Tr.    130:20-133:19
O'Quinn Tr.    133:23-135:5
O'Quinn Tr.    145:9-21
O'Quinn Tr.    147:5-15
O'Quinn Tr.    149:22-150:7
O'Quinn Tr.    150:13-151:2
O'Quinn Tr.    151:7-152:12
O'Quinn Tr.    158:15-23
O'Quinn Tr.    162:14-163:15
O'Quinn Tr.    180:6-181:4
O'Quinn Tr.    236:16-237:16
```

(B) Deposition transcript of Peter G. Weinstock ("Weinstock Tr."), taken on April 7, 2005:

```
Weinstock Tr.    8:5-10:14
Weinstock Tr.    11:5-12
Weinstock Tr.    12:13-15:20
Weinstock Tr.    15:24-16:20
```

```
Weinstock Tr.    17:24-18:12
Weinstock Tr.    18:24-19:16
Weinstock Tr.    19:24-20:8
Weinstock Tr.    20:12-23:15
Weinstock Tr.    29:10-34:19
Weinstock Tr.    39:13-17
Weinstock Tr.    45:11-48:10
Weinstock Tr.    61:8-10
Weinstock Tr.    61:18-65:14
Weinstock Tr.    71:16-72:1
Weinstock Tr.    72:20-73:8
Weinstock Tr.    76:4-15
Weinstock Tr.    77:19-79:2
Weinstock Tr.    79:5-18
Weinstock Tr.    80:15-81:5
Weinstock Tr.    89:4-21
Weinstock Tr.    91:6-14
Weinstock Tr.    111:7-9
Weinstock Tr.    113:18-115:10
Weinstock Tr.    116:9-117:5
Weinstock Tr.    117:25-118:11
Weinstock Tr.    119:11-121:10
Weinstock Tr.    125:23-126:24
Weinstock Tr.    141:10-13
Weinstock Tr.    144:13-145:21
Weinstock Tr.    152:6-153:4
Weinstock Tr.    155:24-158:10
Weinstock Tr.    161:16-162:4
Weinstock Tr.    170:2-4
Weinstock Tr.    170:16-171:13
Weinstock Tr.    179:12-180:8
Weinstock Tr.    184:5-184:25
Weinstock Tr.    187:3-14
Weinstock Tr.    188:19-189:12
Weinstock Tr.    189:16-24
Weinstock Tr.    191:15-21
Weinstock Tr.    197:14-21
Weinstock Tr.    198:1-3
```

(C) Deposition transcript of Robert L. Walters ("Walters Tr."), taken on April 19, 2005:

```
Walters Tr.    6:18-12:23
Walters Tr.    17:2-23
Walters Tr.    19:15-20:25
```

43

```
Walters Tr.      22:17-24:1
Walters Tr.      24:5-18
Walters Tr.      31:1-32:17
Walters Tr.      33:17-35:12
Walters Tr.      38:18-42:14
Walters Tr.      43:24-44:6
Walters Tr.      44:25-45:7
Walters Tr.      46:19-47:9
Walters Tr.      54:10-55:23
Walters Tr.      56:8-15
Walters Tr.      80:18-81:5
Walters Tr.      86:9-16
Walters Tr.      87:20-90:3
Walters Tr.      91:21-94:5
Walters Tr.      95:6-22
Walters Tr.      97:15-98:1
Walters Tr.      120:7-122:24
Walters Tr.      124:1-5
Walters Tr.      125:3-126:5
Walters Tr.      128:17-24
Walters Tr.      130:16-23
Walters Tr.      135:15-137:5
Walters Tr.      139:12-23
Walters Tr.      140:10-141:13
Walters Tr.      142:17-144:24
Walters Tr.      163:12-164:13
Walters Tr.      164:22-165:15
Walters Tr.      186:8-189:14
Walters Tr.      204:5-209:8
Walters Tr.      214:24-215:22
```

(D) Deposition transcript of Alan R. Bromberg ("Bromberg Tr."), taken on March 9, 2005:

```
Bromberg Tr.     6:1-8:1
Bromberg Tr.     9:10-10:15
Bromberg Tr.     20:16-21:6
Bromberg Tr.     35:4-8
Bromberg Tr.     36:10-23
Bromberg Tr.     37:1-11
```

(E) Deposition transcript of Michael J. Blayney ("Blayney Tr."), taken on March 8, 2005:

```
Blayney Tr.      7:18-8:25
```

44

```
          Blayney Tr.      10:23-11:16
          Blayney Tr.      12:18-13:19
          Blayney Tr.      13:20-14:1
          Blayney Tr.      16:2-18:18
          Blayney Tr.      20:4-22:25
          Blayney Tr.      23:8-24:14
          Blayney Tr.      25:18-29:2
          Blayney Tr.      29:4-34:8
          Blayney Tr.      36:14-40:6
          Blayney Tr.      40:15-43:5
          Blayney Tr.      43:10-19
          Blayney Tr.      43:25-46:24
          Blayney Tr.      50:22-54:2
          Blayney Tr.      58:12-62:15
          Blayney Tr.      63:3-8
          Blayney Tr.      63:20-24
          Blayney Tr.      64:18-65:7
          Blayney Tr.      65:8-67:3
          Blayney Tr.      67:9-16
          Blayney Tr.      69:17-71:2
          Blayney Tr.      72:2-74:6
          Blayney Tr.      81:25-83:9
          Blayney Tr.      87:10-16
          Blayney Tr.      87:22-88:2
          Blayney Tr.      88:20-23
          Blayney Tr.      102:3-103:14
          Blayney Tr.      104:9-105:3
          Blayney Tr.      106:4-18
          Blayney Tr.      106:24-107:15
          Blayney Tr.      108:3-21
          Blayney Tr.      109:9-110:11
          Blayney Tr.      110:13-114:8
          Blayney Tr.      114:11-115:11
          Blayney Tr.      120:10-121:1
```

    (F)  Deposition transcript of Charles A. Gall ("Gall Tr."), taken on March 9, 2005:

```
          Gall Tr.         10:12-24
          Gall Tr.         11:2-17
          Gall Tr.         14:10-23
          Gall Tr.         25:1-13
          Gall Tr.         28:4-30:10
          Gall Tr.         39:16-40:14
```

83846451.1

(G)  Trial testimony of Robert L. Walters ("Walters Trial Tr."), dated March 23, 1999:

Walters Trial Tr. 39:9-25

(H)  Deposition transcript of Stephen Skaggs ("Skaggs Tr."), taken on June 20, 2006:

| | | |
|---|---|---|
| Skaggs Tr. | 1:5-6 |
| Skaggs Tr. | 10:5-24 |
| Skaggs Tr. | 24:22-25 |
| Skaggs Tr. | 25:3-12 |
| Skaggs Tr. | 33:12-36:1 |
| Skaggs Tr. | 36:12-21 |

**Jenkens' (Defendant) Deposition Designations:**

(A)  Deposition of George Scharpf taken 6-22-06:

| | |
|---|---|
| 6-18 to 9-10 | 10-21 to 13-17 |
| 26-7 to 28-20 | 29-17 to 35-4 |
| 40-10 to 41-3 | 44-3 to 51-22 |
| 51-23 to 52-10 | 56-4 to 56-18 |
| 57-4 to 59-1 | 65-10 to 66-15 |
| 66-20 to 66-23 | 73-1 to 74-14 |
| 85-25 to 86-22 | 93-24 to 95-20 |
| 98-16 to 99-4 | 100-25 to 101-6 |

———————————————————

(B)  Deposition of George Scharpf in <u>Casey v. Brennan</u>, taken 12-21-98:

| | |
|---|---|
| 5-10 to 6-4 | 11-22 to 16-15 |

46

```
17-22 to 22-23                    23-4 to 23-19

35-3 to 36-23                     41-12 to 47-8

47-13 to 48-14                    49-4 to 51-21

51-22 to 53-4                     53-21 to 55-17

56-14 to 61-24                    65-3 to 65-19

73-18 to 75-10                    83-20 to 84-9

95-13 to 95-19                    95-24 to 96-17
```

    (C)  Trial testimony of George Scharpf in <u>Casey v. Brennan</u>,
3-24-99:

```
55-5 to 56-4                      56-19 to 61-21

70-1 to 72-16                     74-24 to 75-24

76-13 to 78-2                     83-25 to 85-17

86-24 to 88-4                     90-10 to 96-16

132-25 to 133-6                   166-24 to 167-10

172-20 to 173-8
```

    (D)  Trial testimony of George Scharpf in <u>Casey v. Brennan</u>,
3-25-99:

```
4-7 to 6-4                        6-15 to 7-22

7-23 to 8-13
```

83846451.1

(E)   Deposition of Stanley J. Koreyva, Jr. taken 6-26-06:

|  |  |
|---|---|
| 11-19 to 12-25 | 14-16 to 15-22 |
| 22-13 to 23-21 | 26-17 to 27-13 |
| 33-3 to 35-25 | 42-11 to 43-21 |
| 43-22 to 46-1 | 84-8 to 85-1 |
| 85-2 to 85-18 | 86-6 to 86-12 |
| 87-22 to 88-3 | 107-6 to 108-17 |

(F)   Deposition of Stanley J. Koreyva, Jr. in Casey v. Brennan, taken 5-22-98:

|  |  |
|---|---|
| 7-8 to 7-20 | 24-13 to 26-16 |
| 32-11 to 34-15 | 35-22 to 39-1 |
| 41-17 to 46-15 | 59-9 to 60-25 |
| 64-14 to 64-20 | 78-18 to 80-1 |
| 86-11 to 88-5 | 91-19 to 96-13 |
| 97-11 to 100-17 | 101-5 to 102-4 |
| 114-18 to 115-11 | 115-12 to 116-6 |
| 129-7 to 130-10 | 133-6 to 135-5 |
| 146-18 to 146-24 | 146-25 to 150-14 |
| 187-18 to 189-7 | 223-23 to 229-3 |

48

    (G)  Trial testimony of Stanley J. Koreyva, Jr. in <u>Casey v. Brennan</u>, 3-30-99:

| | |
|---|---|
| 2-18 to 6-7 | 6-8 to 8-3 |
| 9-4 to 10-14 | 10-17 to 11-13 |
| 11-14 to 12-14 | 12-15 to 14-15 |
| 17-7 to 18-19 | 28-17 to 29-15 |
| 36-16 to 39-14 | 90-13 to 90-22 |

    (H)  Deposition of Robert Walters taken on 4-19-05:

| | |
|---|---|
| 31-1 to 35-12 | 38-18 to 43-23 |
| 46-19 to 49-13 | 51-20 to 51-23 |
| 52-22 to 59-7 | 65-9 to 73-24 |
| 80-14 to 81-5 | 82-17 to 84-8 |
| 86-9 to 87-10 | 87-16 to 94-8 |
| 95-13 to 95-22 | 97-15 to 98-20 |
| 109-15 to 109-24 | 114-23 to 116-11 |
| 116-23 to 117-14 | 130-16 to 133-2 |
| 135-5 to 135-12 | 136-12 to 138-25 |
| 172-25 to 173-1 | 173-24 to 177-25 |
| 191-13 to 193-4 | |

83846451.1

(I)   Trial testimony of Robert Walters in <u>Casey v. Brennan</u>, 3-23-99:

| | |
|---|---|
| 8-23 to 9-23 | 10-16 to 15-21 |
| 17-7 to 22-6 | 22-7 to 25-17 |
| 33-6 to 34-3 | 34-4 to 36-16 |
| 43-7 to 44-24 | 238-5 to 239-1 |

(J)   Trial testimony of Robert Walters in <u>Casey v. Brennan</u>, 3-30-99:

129-8 to 130-17

(K)   Deposition of Harold Smith taken on 6-27-06:

| | |
|---|---|
| 4-6 to 6-10 | 6-24 to 8-2 |
| 8-21 to 9-3 | 11-22 to 14-17 |
| 17-5 to 18-5 | 21-10 to 22-22 |
| 23-17 to 24-3 | |

(L)   Deposition of Harold Smith in <u>Casey v. Brennan</u>, taken 11-20-98:

55-24 to 56-22

50

83846451.1

(M)   Deposition of Peggy Ann Dembowski taken on 6-27-06:

| | |
|---|---|
| 6-5 to 7-9 | 9-4 to 9-11 |
| 11-9 to 14-5 | 14-22 to 17-11 |
| 18-10 to 18-23 | 37-23 to 39-7 |
| 41-9 to 42-19 | 43-13 to 46-20 |
| 49-2 to 50-18 | 50-22 to 52-15 |
| 53-5 to 55-13 | |

(N)   Deposition of George Brennan, M.D., taken on 7-13-06:

| | |
|---|---|
| 5-16 to 8-19 | 9-24 to 13-1 |
| 19-13 to 22-19 | 23-12 to 25-22 |
| 29-7 to 30-10 | 33-6 to 36-25 |
| 37-4 to 40-9 | 40-16 to 41-15 |
| 43-23 to 44-21 | |

(O)   Deposition of Jonathan Heilbrunn taken on 7-13-06:

| | |
|---|---|
| 5-3 to 7-8 | 7-14 to 9-2 |
| 11-13 to 13-8 | 22-8 to 23-15 |
| 30-17 to 31-21 | 36-18 to 37-10 |

51

83846451.1

(P)   Deposition of Joseph DiSepio taken on 7-13-06:

    5-4 to 7-15               10-21 to 11-14

    14-15 to 14-22         16-20 to 18-3

    22-4 to 24-15          26-5 to 28-10

    28-11 to 28-19         30-17 to 33-5

    36-18 to 38-12


(Q)   Deposition of Patricia Keys taken on 7-25-06:

    6-2 to 7-20               9-18 to 11-20

    22-1 to 22-15          27-6 to 28-3

    31-16 to 34-25         47-2 to 47-4

    48-13 to 51-16         53-24 to 54-19


(R)   Deposition of Frank Kurzawa taken on 7-25-06:

    29-11 to 30-2          38-18 to 40-24


(S)   Deposition of Robert O'Donnell taken on 8-23-06:

    6-3 to 9-24               11-11 to 12-24

    13-25 to 15-6          17-21 to 18-11

    21-25 to 29-8          38-24 to 39-4

    40-20 to 42-19         42-20 to 46-3

83846451.1

46-4 to 47-16                          50-14 to 51-14

53-7 to 54-6

### BAG's (Defendant) Deposition Designations:

BAG   adopts   and   may   utilize   the   deposition designation/readings set forth by Jenkens in the existing draft Final Pretrial Order in this case.

53

9.   **EXHIBITS**   (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. All parties hereby agree that, unless set forth herein, objections to authenticity are deemed waived.)

**Plaintiff (Amboy)**:  SEE ATTACHED TRIAL EXHIBIT LISTS

**Defendant (Jenkens)**:   SEE ATTACHED TRIAL EXHIBIT LISTS

**Defendant (BAG)**:   SEE ATTACHED TRIAL EXHIBIT LIST.   BAG also adopts and may utilize the Exhibits listed in the Joint Exhibit List and Jenkens' Exhibit List.

10.   **SINGLE LIST OF LEGAL ISSUES**. (All issues shall be set forth below. The parties need not agree on any issue. Any issue not listed shall be deemed waived.)

**Amboy's (Plaintiff) Legal Issues:**

A.   <u>Negligence/Legal Malpractice Claim</u>: Against Jenkens

Whether Amboy has proven by a preponderance of the evidence that Jenkens breached the professional standard of care that Jenkens owed to Amboy as Amboy's legal counsel in the Subchapter S conversion.

Whether Amboy has proven by a preponderance of the evidence that such a breach by Jenkens was the proximate cause of the damage suffered by Amboy.

B.   <u>Negligence/Professional Malpractice Claim</u>: Against BAG

Whether Amboy has proven by a preponderance of the evidence that The Bank Advisory Group ("BAG") breached the professional standard of care that it owed to Amboy as a specialist and professional retained by Amboy to assist Amboy in the field of bank valuation and Subchapter S conversion.

54

Whether Amboy has proven by a preponderance of the evidence that such a breach by BAG was the proximate cause of the damage suffered by Amboy.

C.   Damages:  Against Jenkens and BAG

The amount of damages that Amboy has proven by a preponderance of the evidence were caused by Jenkens' legal malpractice.

The amount of damages that Amboy has proven by a preponderance of the evidence were caused by BAG's professional malpractice.

**Jenkens' (Defendant) Legal Issues:**

A.   Negligence:

(1)   Did Jenkens & Gilchrist have and use the degree of knowledge and skill that was normally possessed and employed by New Jersey lawyers engaged in the practice of transactional law in 1997?

    (a)   Legal question:  As of 1997, had New Jersey law expressly precluded the use of minority and marketability discounts in valuing stock in the context of a squeeze-out merger?

    (b)   Legal question:  If not, was Jenkens & Gilchrist negligent as a matter of law by not correctly predicting that New Jersey law would disallow the use of minority and marketability discounts in valuing stock in the context of a squeeze-out merger?

(2)   Did The Bank Advisory Group Inc. have and use the degree of knowledge and skill that was normally possessed and employed by an expert engaged in the valuation of the stock of a corporation in 1997?

(3)   Was Amboy Bancorporation itself negligent in assuming the risk that New Jersey law would not

55

permit the use of discounts in valuing the stock of its cashed-out shareholders, in setting the price to be paid for that stock, in failing to follow the recommendations of its counsel with regard to the proxy statement, and/or in declining to voluntarily stay or unwind the merger pending the outcome of the valuation case?

B.   <u>Proximate Cause</u>:

   (1)   Was the negligence of Jenkens & Gilchrist (if any) a substantial contributing factor in causing any damage to Amboy Bancorporation?

   (2)   Was the negligence of The Bank Advisory Group Inc. (if any) a substantial contributing factor in causing any damage to Amboy Bancorporation?

   (3)   Was the negligence of Amboy Bancorporation an intervening, superseding cause and/or the sole proximate cause of the damages that it is claiming?

   (4)   Jenkens and Gilchrist preserves for consideration at trial and subsequent appeals its legal and factual arguments raised in its partial summary judgment motion relating to proximate cause and the independent duty to pay a fair price which was granted by the District Court on August 13, 2008 and vacated by the Circuit Court on April 25, 2011. It incorporates by reference the arguments contained in its papers filed in connection that motion, the reconsideration motion, the conversion to a final judgment and on appeal to the Circuit. It shall rely upon such additional facts as may be developed at trial.

C.   <u>Damages</u>:

   (1)   Did Amboy Bancorporation sustain any damage?

83846451.1

(a)     Legal question:   In a squeeze-out merger in which the surviving shareholders of the corporation have a self-interest in paying less than fair value for the shares of those being cashed out, are the cashed-out shareholders entitled to receive fair value for their shares irrespective of whether the proxy statement was misleading?

(b)     Legal question:   If so, can any portion of the fair value that Amboy Bancorporation has been required to pay to its cashed-out shareholders for their stock constitute legally compensable damages?

(c)     Are the costs incurred by Amboy in connection with the squeeze-out merger and subsequent litigation recoverable as damages when they are more than offset by the benefits that the corporation and its surviving shareholders have derived from the transaction?

**BAG's Legal Issues**

BAG adopts the list of Legal Issues set forth in the existing draft Final Pretrial Order in this case.   In addition, BAG also lists the following additional list of legal issues:

• Whether Amboy's negligence claims against BAG are barred by the statute of limitations;

• Whether Amboy's negligence claim against BAG should be dismissed as Amboy has no expert witness to testify as to the standard of care BAG allegedly should have followed, and as to how BAG allegedly deviated from any such standard of care.

• Whether Amboy is liable to BAG on BAG's indemnification counterclaim against Amboy for attorneys' fees and expenses and other costs and damages incurred by BAG in this matter. Indemnification is sought by BAG in its counterclaim pursuant to the indemnification section of the written retainer agreement pursuant to which Amboy retained BAG.

11.  **MISCELLANEOUS** (Set forth any matters which require action or should be brought to the attention of the Court.)

BAG states that it is proceeding on its counterclaim against Plaintiff at trial.  The gist of the counterclaim is that Plaintiff's written retainer agreement with BAG contains an indemnification clause which provides that Plaintiff will indemnify BAG against certain types of damages BAG suffers arising out of Plaintiff's retention of BAG.  BAG is seeking to recover, inter alia, the attorneys' fees and expenses it has incurred defending this case pursuant to this indemnification clause.

12.  **TRIAL COUNSEL** (List the names of trial counsel for all parties)

**Amboy's (Plaintiff) Trial Counsel:**

Dennis T. Kearney, Esq.
Camille V. Otero, Esq.
Denise R. Rosenhaft, Esq.

**Jenkens' (Defendant) Trial Counsel:**

Edward B. Deutsch, Esq.
James G. Gardner, Esq.
George C. Jones, Esq.

**BAG's (Defendant) Trial Counsel:**

Mitchell B. Seidman

13.  **JURY TRIALS**

**Schedule to be established (per Mag. Judge Falk).**

BAG has previously filed its Trial Brief and In Limine motion/brief in this matter.

A.   Each party shall submit to the Court and to opposing counsel a trial brief in accordance with

58

L. Civ. R. 7.2(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law. **THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE. FAILURE TO BRIEF ANY ISSUE, INCLUDING AN EVIDENTIARY ISSUE WHICH SHOULD HAVE BEEN ANTICIPATED, WILL BE DEEMED TO BE A WAIVER OF SUCH ISSUE.** In the event a brief is not submitted timely, the delinquent party's pleading may be stricken, or other sanctions imposed.

B.   Each party shall submit to the Court and to opposing counsel any hypothetical questions to be put to an expert witness on direct examination.

14.   **JURY INSTRUCTIONS VOIR DIRE, NEUTRAL STATEMENT OF THE CASE AND VERDICT SHEET.**

The parties are to confer and prepare agreed—upon jury instructions, voir dire questions, verdict sheet and a neutral statement of the case (limited to two (2) typewritten pages) to be read to the jury panel, all of which must be submitted at the final pretrial conference, or as ordered by the Magistrate Judge Mark Falk. Jury instructions are to be submitted in the following format:

A.   The parties shall obtain from the Magistrate Judge Mark Falk a copy of the Court's "Standard General Jury Instructions" These are standard instructions that have been used without objection in prior trials. These instructions do not address the substantive elements of any causes of action. These instructions are to be incorporated in the proposed instructions, wherever possible. If a party has any objections to any of these proposed instructions they shall immediately advise their adversary and the Court.

In preparing the jury instructions, the parties shall:

(i) Use common words, not legalese, whenever possible.

59

(ii) Use simple sentences; avoid subordinate clauses.

(iii) Avoid double negatives.

(iv) Use the active voice.

(v) Avoid abstract instructions; tailor instructions to case.

(vi) Avoid unnecessary instructions.

B.   The parties shall also confer and agree upon a verdict sheet and shall follow the above designated procedure for arriving at jointly agreed upon instructions where applicable.

C.   The Court also has "Standard Preliminary Instructions" which the Court reads to the jury before the commencement of the trial. Counsel shall also obtain a copy of these preliminary instructions and shall immediately advise counsel and the Court prior to the trial if there is any objection to the preliminary instructions.

D.   Counsel shall also confer and agree upon a neutral statement summarizing the case that the Court can use in orienting the panel as to the kind of case this is. This shall be limited to two (2) typewritten pages.

E.   The parties are required to jointly submit one set of agreed upon instructions incorporating the standard instructions.

It is not enough for the parties to merely agree upon the standard general instructions, and then each submit their own set of substantive instructions. The parties are expected to meet, confer and agree upon the substantive instructions for the case.

To accomplish this the parties are required to serve their proposed instructions upon each other prior to the final pretrial conference. The parties then are required to meet or confer and

60

submit to the Court one complete set of agreed upon instructions.

F.   The parties are required to submit the proposed joint set of instructions and proposed supplemental instructions in the following format:

(i) There must be two sets of each instruction;

(ii) The first copy should indicate the number of the proposed instruction, and the authority supporting the instruction; and

(iii) The second copy should contain only the proposed instruction — there should be no other marks or writings on the second copy except for a heading reading "Instruction # " with the number left blank.

(iv) The parties shall also submit to the Deputy Clerk where possible a 3.5" disc in Word Perfect (preferably 5.1) containing the second copy referenced in paragraph (iii)

G.   All instructions should be short, concise, understandable and neutral statements of law. Argumentative or formula instructions are improper, and will not be given and should not be submitted.

H.   Parties should also note that any modifications of instructions from statutory authority, or Devitt, Blackmar & O'Malley (or any other form instructions) must specifically state the modification made to the original form instruction and the authority supporting the modification.

I.   The parties are directed to obtain from Judge Cavanaugh's Deputy Clerk, Michael DeCapua, the Court proposed and preferred voir dire questions. If there is any objection to the proposed voir dire questions, counsel should immediately advise the Court and its adversary in writing.

J.   If either party feels that additional voir dire questions should be submitted, the parties are required to jointly submit a set of agreed upon

61

voir dire questions. Accordingly, the parties are required to serve their proposed voir dire upon each other three weeks prior to trial and shall follow the above designated procedure for arriving at jointly agreed upon instructions where applicable.

The foregoing must be submitted **forty-eight (48) hours before** the final pretrial conference, or as directed by the Magistrate Judge Mark Falk.

Failure to comply with any of the above instructions may subject the non-complying party and/or its attorneys to sanctions.

15.   **NON-JURY TRIALS**

At least **forty-eight (48) hours prior to the final pretrial conference, or as directed by the Magistrate Judge Mark Falk,**

A.   Each party shall submit to the Court and to opposing counsel a trial brief in accordance with L. Civ. R. 7.2(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law. **THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE. FAILURE TO BRIEF ANY ISSUE, INCLUDING AN EVIDENTIARY ISSUE WHICH SHOULD HAVE BEEN ANTICIPATED, WILL BE DEEMED TO BE A WAIVER OF SUCH ISSUE.** In the event a brief is not submitted, the delinquent party's pleading may be stricken.

B.   Each party shall submit to the Court and to opposing counsel proposed Findings of Fact and Conclusions of Law.

C.   Each party shall submit to the Court and to opposing counsel any hypothetical questions to be put to an expert witness on direct examination.

83846451.1

16.   **BIFURCATION** (When appropriate, liability issues shall be severed and tried to verdict.  Thereafter, damage issues will be tried.)

The issues of liability and damages **SHALL NOT** be tried separately.


17.   **ESTIMATED LENGTH OF TRIAL**

_____ days for liability and _____ days for damages.


18.   **TRIAL DATE:**   _____

63

83846451.1

AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

COUNSEL ACKNOWLEDGE RECEIPT OF "TRIAL REQUIREMENTS OF THE HON. DENNIS M. CAVANAUGH."

_____
DENNIS T. KEARNEY
Attorney for Plaintiff
Amboy Bancorporation


_____
EDWARD B. DEUTSCH
Attorneys for Defendant
Jenkens & Gilchrist


_____
MITCHELL B. SEIDMAN
Attorneys for Defendant
The Bank Advisory Group


Dated: February 24, 2012        _____

                                **MARK FALK**
                                **UNITED STATES MAGISTRATE JUDGE**


64

AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

COUNSEL ACKNOWLEDGE RECEIPT OF "TRIAL REQUIREMENTS OF THE HON. DENNIS M. CAVANAUGH."

_____

DENNIS T. KEARNEY
Attorney for Plaintiff
Amboy Bancorporation

_____

EDWARD B. DEUTSCH
Attorneys for Defendant
Jenkens & Gilchrist

_____

MITCHELL B. SEIDMAN
Attorneys for Defendant
The Bank Advisory Group

Dated: February __, 2012        _____

**MARK FALK**
**UNITED STATES MAGISTRATE JUDGE**

64

AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS
THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE
AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE
CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE
REQUEST OF COUNSEL.

COUNSEL ACKNOWLEDGE RECEIPT OF "TRIAL REQUIREMENTS OF THE HON.
DENNIS M. CAVANAUGH."


_____
DENNIS T. KEARNEY
Attorney for Plaintiff
Amboy Bancorporation


_____
EDWARD B. DEUTSCH
Attorneys for Defendant
Jenkens & Gilchrist

2/24/12

_____
MITCHELL B. SEIDMAN
Attorneys for Defendant
The Bank Advisory Group


Dated: February 29, 2012

_____
MARK FALK
UNITED STATES MAGISTRATE JUDGE


64

## RIDER ON LENGTH OF BRIEFS

The attention of the parties is directed to L. Civ. R. 7.2(b) as amended by Order filed September 3, 1991. Briefs "shall not exceed 40 <u>ordinary</u> typed pages***" (emphasis added). This page limitation shall be <u>strictly enforced</u>.

When submitting a brief in accordance with General Rule 273, a party may request special permission to submit an additional brief on any point or points deemed to need additional pages of argument. This request must be made by letter not to exceed two ordinary typed or printed pages and <u>must</u> be submitted with the brief.

The Court shall, in its sole discretion, decide whether to allow additional briefing on review of the party's General Rule 27B brief and letter.

The Court also reserves the right, in its sole discretion, to require additional briefing on any point or points after review of the written submissions of the parties or oral argument.

65

83846451.1